[Crim No. 5564. In Bank. Aug. 11, 1954.]

THE PEOPLE, Respondent, v. JOHN A. SANTO et al.,
Appellants.

§

Ward Sullivan and Al Matthews, under appointment by the Supreme Court, for Appellants.

Edmund G. Brown, Attorney General, William V. O'Connor, Chief Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), Adolph Alexander, Assistant District Attorney, Jere J. Sullivan, Robert Wheeler and J. Miller Leavy, Deputy District Attorneys, for Respondent.

SCHAUER, J.—John Santo, Emmett Perkins, and Barbara Graham (hereinafter sometimes called defendants) appeal from judgments imposing the death penalty after a jury found them guilty of murder of the first degree and made no recommendation as to punishment, and from orders denying their motions for new trial. Defendants and John True were jointly charged by indictment in Count I with conspiracy to violate sections 211 (robbery), 459 (burglary) and 187 (murder) of the Penal Code, and in Count II with murder. On motion of the People a severance was granted as to the two counts, and the cause proceeded to trial as to Count II (murder) only. Count I was ordered off calendar. Count II was dismissed as to John True and he testified on behalf of the People.

Defendants' main contention is that the testimony of the principal prosecution witness, the accomplice John True, was insufficiently corroborated. We have concluded, for the reasons hereinafter elucidated, that this and other contentions of defendants are without merit.

Mrs. Mabel Monahan, victim of the homicide, had been the mother-in-law of Tutor Scherer, a Las Vegas gambler. Mrs. Monahan lived in Burbank, California. She was 64 years old, crippled, and lived alone. From the evening of March 8, 1953, until the afternoon of March 9 she had a house guest. When the guest left, Mrs. Monahan's house was neat. At about 6 p. m. on March 9 the guest spoke with Mrs. Monahan on the telephone. So far as the evidence discloses, this was the

last time Mrs. Monahan communicated with anyone other than the defendants.

On the morning of March 11, 1953, Mrs. Monahan's gardener, when he came to work, discovered the front door of the house ajar and telephoned the police. The interior of the house was greatly disarranged; apparently it had been ransacked; and there were spots of blood on the walls of the living room and halls. The body of Mrs. Monahan was on the floor, partially in a closet, with her head on a pillowcase which was torn and saturated with blood. Mrs. Monahan's hands were tied behind her. A strip of cloth, knotted but not tightened, was around her neck. The cause of death was asphyxia due to strangulation. On Mrs. Monahan's face and head were severe cuts and bruises which could have been inflicted with the muzzle of a revolver. In a closet among other purses was a purse which contained $474 and jewelry.

About March 12 or 14 William Upshaw and Baxter Shorter were arrested in connection with the investigation of the Monahan killing. They were released after being held in custody a few days. On March 31 Shorter, with his attorney, met with several law enforcement officers and made a statement which was taken down by a stenographer. About April 14 Shorter disappeared.

On April 11 John True was arrested in Grass Valley and informed that Shorter had implicated him in the killing. He was held in the Burbank jail until April 16 and was released after he had repeatedly denied any participation in the offense and disclaimed acquaintance with any defendant except Santo. True was rearrested on June 2 in San Francisco and agreed to testify as a witness for the People in return for an agreement by a Los Angeles deputy district attorney that if True told the truth he would not be prosecuted for any offense in Los Angeles County.

True's testimony was substantially as follows: True became acquainted with Santo in Grass Valley in January, 1952. In early March True mentioned to Santo that he intended to go to Los Angeles to inquire about a job; Santo said that he was going to Los Angeles on business; and True accepted Santo's invitation to ride with him. As they drove to Los Angeles Santo told True that he was making the trip because of "a gold deal . . . He said he had access to placer gold."

True and Santo stayed at a motel in El Monte for two days. While they were there Santo introduced True to Perkins. Santo and True then moved to another motel, the

Sunlight Motel in El Monte, where they stayed for one night. On March 7, 1953, they moved to the La Bonita Motel, also in El Monte. Shorter and Upshaw visited Santo there; True met them, then left the motel while they talked with Santo. Thereafter Santo told True that Shorter was a "box man" and explained that this meant that Shorter was experienced in "blowing a safe, opening a safe."

On the morning of March 9 Perkins brought Mrs. Graham to the La Bonita Motel. The three defendants and True drove in Santo's car to a "drive-in stand" where they met Upshaw and Shorter. Santo got in the car with Upshaw and Shorter and conversed with them. True heard only a part of the conversation; he heard Upshaw say, "I don't want no part of it"; Shorter said that he did not "like the idea of a woman going along" and Santo replied, "I will assure you this one is all right in the event that we need her to make an entrance." Santo returned to his own car, said that Upshaw "has backed completely out," and asked, "What do you think?" Perkins and Mrs. Graham replied, "Whatever you want to do." True said, "Whatever you folks want to do." Santo returned to Shorter's car after telling Perkins to follow Shorter. True heard no one say where they were going. The two cars drove past the Monahan home. Santo pointed to the house and Perkins said, "That must be the place." Thereafter Santo told Shorter to meet defendants and True that evening at a designated parking lot.

After True and Santo returned to the motel, True asked Santo "what the score was." Santo said that Tutor Scherer had brought money from Las Vegas a "hundred thousand dollars at a time" and hidden it in the Monahan house. True said that he would "go . . . along on the job" if Santo could assure him that no one would be hurt.

. About 6 p. m. on March 9 defendants, True, and Shorter met at the parking lot. True, the only member of the party without gloves, purchased a pair. Perkins gave True a gun and told him not to come back without it. The party drove to Mrs. Monahan's house. Santo told Mrs. Graham to "ring the doorbell . . . and if there was anyone home, to detain them until we got there." Mrs. Graham entered the house. True followed her and saw her striking Mrs. Monahan on the face and head with a gun. Mrs. Monahan collapsed and Mrs. Graham put a pillow slip over her head. Meanwhile, Santo, Perkins, and Shorter had entered the house. Perkins tied Mrs. Monahan's hands behind her and dragged her to a closet.

Santo tied a strip of cloth around her face. Defendants, True, and Shorter searched the house for fifteen or twenty minutes; they found no safe, money, or jewels. They left the house together; True and the defendants returned to the La Bonita Motel; and about midnight Santo and True left for Grass Valley.

The following evidence was introduced by the People in corroboration of True's testimony:

William Upshaw testified as follows: He met Santo in Auburn in February, 1953, and in Los Angeles on March 6 in connection with "a gold transaction." On the morning of March 7 Upshaw took Shorter to meet Santo at the La Bonita Motel. There Upshaw and Shorter were introduced to True. True left the motel while the other three talked about the purchase of gold. On March 9 Shorter and Upshaw met defendants and True at the "drive-in." Santo got in Shorter's car, which was parked very close to Santo's car. Shorter told Santo that he "decided he wasn't going to go" and Upshaw "wasn't going to go" because a "record downtown" indicated that they "had previously cased the place, or one of Tutor Scherer's places." Santo replied that "he was definitely going to go through with it . . . [W]e are going to go in the place tonight." Shorter said that he "didn't want to have anything to do with women anyway," and Santo said, "You don't have to worry about her because she knows what the hell will happen if she ever opens her mouth." Shorter then said, "Well, if I am going to get the blame for it, I might as well go for the money." Santo returned to his car, told Perkins, Mrs. Graham, and True that Shorter "had decided to go" but that Upshaw "definitely wasn't going to go." Santo asked Perkins, Mrs. Graham, and True what they wished to do, and they all agreed to accompany him. Santo returned to Shorter's car, said "we'll drive by the place," told Perkins, Mrs. Graham, and True to follow, directed Shorter to the Monahan house, and pointed at it as they drove past. Santo arranged to meet Shorter at a parking lot that afternoon, then returned to the other defendants and True.

Samuel Sirianni, a policeman, gave the following testimony, which was offered and received only against Mrs. Graham to show consciousness of guilt and admissions against interest: Sirianni had three conversations with Mrs. Graham while she was in jail awaiting trial. He represented to her that he intended to help her account for her whereabouts on the night of the murder. During one of these conversations Mrs.

Graham admitted that she was with Santo, Perkins, and True on March 9 from 8 p. m. until midnight. She also said, "Without you as an alibi, I'm doomed to the gas chamber." Sirianni asked when the murder took place; Mrs. Graham replied that it was on March 9; " 'Actually,' she said, 'it was the morning of the 10th.' " Sirianni inquired several times about Shorter; Mrs. Graham said, "He is well taken care of . . . Yes, been done away with. I assure you he won't be at the trial." In reply to Sirianni's question whether she thought their alibi would be sufficient, she said, "I do—for this reason —there's not one shred of evidence."

The People also introduced evidence that about April 10 defendants left their respectives homes and took up residence at the Ambassador Motel. At that time the newspapers were carrying the story that defendants had been implicated in the Monahan killing. Mrs. Graham testified that about the time defendants moved they heard from a friend of Perkins that True had named them in connection with the murder. From the Ambassador Motel defendants moved to Seal Beach. After about three days they went to Lynwood, to a building which was in part a machine shop and in part a small apartment; they were arrested there on May 4, 1953.

### The Witness Upshaw as an Accomplice

Defendants contend that Upshaw was an accomplice as a matter of law; that, therefore, his testimony cannot be considered in corroboration of True; and that the court erred in failing to so instruct the jury. An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.) ■ If the undisputed evidence establishes that a witness is an accomplice, the jury should be so instructed, but if the facts as to complicity are in dispute, the question should be left to the jury. (*People* v. *Barclay* (1953), 40 Cal.2d 146, 151-152 [252 P.2d 321], and cases there cited.) ■ Upshaw testified that Shorter, in Upshaw's presence, told Santo that Upshaw would not join in the proposed criminal enterprise; he testified further that he (Upshaw) was not in defendants' company on the evening of the murder. His mere presence in the automobile when the defendants and True "cased" the Monahan home would not make him an accomplice. ■ Since it could be inferred that Upshaw was not an accomplice, the question whether he was, was properly left to the jury, and as a reviewing court, we are bound to presume in favor of affirming

the judgment that the jury found that he was not an accomplice.

### Sufficiency of the Corroboration of True

Defendants' main contention is that the People failed to produce sufficient evidence corroborative of the testimony of the accomplice True. Section 1111 of the Penal Code, quoted in part above, provides, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ."

 The accomplice need not be corroborated as to every fact to which he testifies. The evidence which corroborates the accomplice need not be direct; it may be circumstantial. Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant. (*People* v. *Henderson* (1949), 34 Cal.2d 340, 342-343 [209 P.2d 785]; *People* v. *Barclay* (1953), *supra,* 40 Cal.2d 146, 156; *People* v. *Wayne* (1953), 41 Cal.2d 814, 822 [264 P.2d 547].) To be sufficient the implicating evidence "must relate to some act or fact which is an element of the offense." (*People* v. *Gallardo* (1953), 41 Cal.2d 57, 63 [257 P.2d 29].)

 The independent evidence which tends to connect Mrs. Graham with the crime (her admissions to Officer Sirianni, her attempt to rig a false alibi, and her flight after she knew she was suspected of the crime) is sufficient. False and contradictory statements of a defendant in relation to the charge are themselves corroborative evidence. (*People* v. *Taylor* (1924), 70 Cal.App. 239, 244 [232 P. 998].)

 Mrs. Graham in her testimony "ventured upon an explanation [of her flight] so unusual that the triers of fact could conclude that it was an intentional fabrication indicating consciousness of guilt and the absence of any true exculpatory explanation." (*People* v. *Wayne* (1953), *supra,* 41 Cal. 2d 814, 823.) She testified that in early April, 1953, after she had left her home and was staying in a house in El Monte owned by Perkins, Santo also moved into the El Monte house; that the defendants then moved to the Ambassador Motel on Figueroa Street in Los Angeles "to meet a friend of ours on a guano deal. . . . [T]he party that was supposed to come down on business for the guano we didn't know whether he would be able to locate the place in El Monte, he wasn't too

familiar with it; so we figured that out there [the Ambassador Motel] he wouldn't have any trouble finding it''; that she was interested in the guano deal because she thought that she might invest some money in it; that she anticipated getting this money by gambling, one of her usual occupations (she worked for Perkins as a ''shill''). In addition to the foregoing testimony as to the reason for defendants' moving to the Ambassador Motel, Mrs. Graham, in answer to the question, ''what was the occasion for your moving?'' testified, ''Well, I don't recall now whether it was just after we had moved to the motel or if it was just before, . . . but someone had called Mr. Perkins and told him that the police had arrested a Mr. John True in connection with the Monahan murder case; and Mr. True had implicated . . . Mr. Perkins and Mr. Santo and myself.'' Mrs. Graham further testified that she read newspaper articles which stated that True had accused defendants of the Monahan killing (this information was first published the night of April 13) and that about the time she read such articles defendants moved from the Ambassador Motel to the Sunset Motor Motel in Seal Beach; that they stayed there ''from one to three days, I believe, I am not sure,'' and that they then moved to an apartment in Lynwood and remained there until May 3, when they were arrested; that she read in the newspapers that Baxter Shorter had disappeared on the night of April 14, 1953, and that it was believed he had been kidnapped; that after the newspapers stated that True had accused defendants of the Monahan killing defendants engaged an attorney and on his advice defendants moved to the Lynwood apartment, which belonged to an investigator to whom the attorney had referred defendants.

■ There is other nonaccomplice testimony, sufficient although perhaps slight, which tends to show that the association of Santo, Perkins, and True, as well as Mrs. Graham, was not innocent but connected with and for the purpose of committing a crime on the night of March 9 at the house of Mrs. Monahan. According to the witness William Upshaw, not a conspirator, on the morning of March 9 Santo, Perkins, Shorter, True and Mrs. Graham agreed that on that evening they would join in some sort of activity in which Upshaw refused to participate; Santo said, ''we'll drive by the place,'' and at his direction the entire party drove past Mrs. Monahan's house; Santo thereafter arranged to meet Shorter on the evening of March 9 at the place where, according to the

testimony of the witness True, the persons who did participate in the Monahan killing met. ■ Independent evidence, not corroborative because it merely shows the commission of the offense and the circumstances thereof (Pen. Code, § 1111), supports the conclusion that the crime was first degree murder in the attempt to commit robbery;[1] there is corroborative evidence relating to an act or fact which is an element of the offense; i.e., there is evidence that the purpose of the planned visit to Mrs. Monahan's house was the obtaining of money[2] in a criminal manner.[3] From the common intent of defendants and of Shorter and True, as evidenced to the witness Upshaw, it may be inferred, in the light of the other circumstances shown, that the defendants did go to the Monahan dwelling and commit the crime of which they have been convicted. (See *People* v. *Alcalde* (1944), 24 Cal.2d 177, 185 [148 P.2d 627].)

The record contains the following nonaccomplice testimony as to the conduct of defendants after March 9, the night of the slaying: Mrs. Perkins testified that her husband left their home in Alhambra "the first week of April" and never returned. Harriet Henson, common law wife of Santo, testified that Santo returned from Los Angeles to their home in Auburn on the afternoon of March 10; that later that evening True came to their house. On the afternoon of April 10, 1953, Santo registered for defendants at the Ambassador Motel under the designation "J. S. Santo & Party"; Mrs. Graham had her infant boy with her, but the child was no longer with the party when they checked out on April 14. As previously indicated, Los Angeles newspapers published the night of April 13 contained articles which stated that True was in custody in connection with the Monahan killing and had accused persons named "Jack," "Emmett," and "Barbara." On the afternoon of May 4, 1953, defendants were arrested in Lynwood in the small apartment adjoining a machine shop. The apartment consisted of a front room which contained a

---

[1]The body of the victim evidenced the use of force; the condition of the house evidenced a search for concealed property.

[2]The conspirator Shorter expressly stated, in the presence of the other conspirators, that he would join them "for the money."

[3]In the presence of the other conspirators Shorter made a statement indicating that the enterprise would involve "blame" and Santo made a statement indicating that talking of the enterprise with persons who were not members of the conspiracy would involve reprisal; at the direction of Santo the entire party drove past Mrs. Monahan's house, a trip which, it could be inferred, would not have been called for if their proposed subsequent visit to the house was for a legitimate business or social purpose.

mattress lying on the floor, a "bedroom with a bed and some miscellaneous furniture, very small," a kitchen and a service porch.

In connection with the evidence last above summarized, defendants Santo and Perkins urge that the evidence of their association is not sufficient corroboration; that "There was nothing . . . in connection with their registration as occupants of the Ambassador Motel to indicate that any attempt had been made to conceal their identity. Their removal from that Motel and their occupancy of other premises at the time of their arrest was, . . . upon the undisputed testimony [the testimony of Barbara Graham], upon the instigation and advice of an attorney upon whom they had every legal right to rely. . . . As to the association of [Santo and Perkins] . . . with their co-defendant Barbara Graham, following the commission of the offense charged in the indictment, . . . it may reveal some anxiety under the reported disappearance of Baxter Shorter, but no where does it show flight, concealment or consciousness of guilt in connection with the alleged murder of Mabel Monahan."

It is true that the evidence of the conduct of defendants between the time of the slaying and the time of the arrest does not specifically and directly evidence consciousness of guilt of the killing of Mrs. Monahan, any more than it evidences consciousness of guilt of the reported kidnapping of Shorter or consciousness of preparation for a "guano deal." It was for the jury to determine the weight, if any, against defendants of such evidence. They could view the conduct of defendants as evidence of flight. And the flight of one who knows that he is suspected of or charged with crime may be indicative of guilt (*People* v. *Hoyt* (1942), 20 Cal.2d 306, 313 [125 P.2d 29]) and corroborative of an accomplice's testimony (*People* v. *Armstrong* (1896), 114 Cal. 570, 574 [46 P. 611]; *People* v. *Taylor* (1924), *supra*, 70 Cal.App. 239, 244; *People* v. *White* (1941), 48 Cal.App.2d 90, 95 [119 P.2d 383]; *People* v. *Parker* (1947), 80 Cal.App.2d 128, 134 [181 P.2d 16]). Whether the actions of defendants amounted to flight and denoted a consciousness of guilt was for the jury's determination.

*Publicizing of the Case, Presence of Armed Guards, and Searching of Spectators at the Trial as Deprivation of Fair Trial*

Defendants contend that the trial court abused its discretion in denying their motions for mistrial and change of

venue made at the conclusion of the evidence. They argue that they were not accorded a fair trial for the following reasons: Newspaper, radio, and television publicity during the trial accused them of participation in various murders and other felonies throughout the state; armed officers were present in the courtroom during the entire proceedings; persons coming into the courtroom were searched before they were allowed to enter. It was stipulated that no member of the district attorney's office had any part in the adverse publicity. There was nothing to show that this adverse publicity was conveyed to the jury. Immediately after the jury were sworn, the trial court admonished them to avoid reading about the case in the newspapers or hearing about it on radio or television. As this court stated in *People* v. *Gomez* (1953), 41 Cal.2d 150, 162 [258 P.2d 825], "Presumably the jurors heeded these admonitions and, upon the entire record, we cannot hold that because of the publications mentioned the defendant was deprived of a fair trial." To support their contention that the adverse publicity prevented a fair trial defendants rely upon the concurring opinion of Mr. Justice Jackson, joined by Mr. Justice Frankfurter, in *Shepherd* v. *Florida* (1951), 341 U.S. 50 [71 S.Ct. 549, 95 L.Ed. 740]. There is nothing to indicate that there existed here a situation such as that which Justice Jackson found in the Shepherd case, where "defendants were prejudged as guilty and the trial was but a legal gesture to register a verdict already dictated by the press and the public opinion which it generated" (p. 51).

Defendants do not contend that the searching of the persons who entered the courtroom was in the presence of or came to the knowledge of the jury. Defendants, therefore, could not have been prejudiced by the searching. (*People* v. *Ruef* (1910), 14 Cal.App. 576, 606 [114 P. 48, 54].) The trial judge stated that he felt armed officers necessary to assure an orderly trial; the judge was correct in his conclusion that it was his duty to take whatever steps were necessary to see that no conduct on the part of any person obstructed the administration of justice. (*People* v. *Harris* (1920), 45 Cal.App. 547, 552-553 [188 P. 65].)

### Other Claims of Error by Defendant Graham

Mrs. Graham contends that a separate trial should have been ordered as to her because evidence was introduced at the trial which would have been inadmissible if she had been

tried separately and because it was to her disadvantage to be associated with "these other sordid characters." ▮ A defendant is not entitled as a matter of right to a separate trial. (See Pen. Code, § 1098.) ▮ A motion for a severance must be decided upon the showing made at the time of the making of the motion and not upon what may have transpired thereafter at the trial. (*People* v. *Pierson* (1934), 139 Cal.App. 734, 736 [34 P.2d 755].) The judge admonished the jury to consider evidence which was admissible against only one defendant in connection with that defendant only. ▮ It is not necessarily an abuse of the trial court's discretion to refuse a motion for separate trials made on the ground that damaging testimony admissible against one defendant and not admissible against another may be received; in the absence of a strong showing to the contrary it is to be presumed that an instruction such as the one given here sufficiently protects the defendant. (*People* v. *Isby* (1947), 30 Cal.2d 879, 897 [186 P.2d 405].) Furthermore, the record here fails to disclose that defendant Graham moved for a severance.

▮ Mrs. Graham also attacks the action of the trial court in overruling her objections to certain testimony of Deputy Sheriff Bowers. Bowers was asked, "Did you know in August of this year that at least one prisoner was in the County Jail involved in that [Monahan] case?" Objections that "That assumes facts not in evidence" and "[calls] for a conclusion on the part of this witness" were overruled. Bowers answered "Yes" and testified that such prisoner was named Barbara Graham.

Mrs. Graham had testified as to being in jail and accused of the Monahan murder in August, 1953. If there was any error in the admission of Bowers' testimony it was so inconsequential that it cannot reasonably be considered to have prejudiced defendant Graham.

For the reasons above stated the judgments and the orders denying a new trial are affirmed.

Shenk, Acting C. J., Carter, J., Traynor, J., Spence, J., and Dooling, J. pro tem.,* concurred.

Appellant's (Graham) petition for a rehearing was denied September 8, 1954.

---

*Assigned by Chairman of Judicial Council.