Filed 2/25/13  P. v Ormonde CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SCOTT TOSTE ORMONDE,<br><br>    Defendant and Appellant. | 2d Crim. No. B233566<br>(Super. Ct. No. 1349406)<br>(Santa Barbara County)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 31, 2013, be modified as follows:

1. On page 7, the second full paragraph beginning with "Chavez's and Negrete's testimony was adequately corroborated" is deleted and the following paragraph is inserted in its place:

Chavez's and Negrete's testimony was adequately corroborated by other evidence connecting Ormonde with narcotics sales.  Officers found a room with a couch, a television set, and marijuana growing in the closet, like the room described by Chavez where the sales took place.  A police officer found a "secondary cell phone with a picture of one of our GPS trackers on it."  The photo of the GPS device tended to connect Ormonde with the narcotic sales network.  It was a walkie-talkie type phone, the type Chavez

and Negrete said he used to set up sales transactions. "Unusual" phone calls were coming in on the phone. "The direct connect was going off. It was alerting." When the officer clicked the alert button to make it stop, he heard a male voice say, "Primo." This corroborated Chavez' testimony that Ormonde used different names with different phones, conduct that is consistent with the sale of narcotics. Ormonde had changed his phone multiple times, as Chavez said they did to avoid detection. The jury rejected Ormonde's innocent explanations. False and contradictory statements of a defendant in relation to the charge against him are themselves corroborative evidence. (*People v. Santo* (1954) 43 Cal.2d 319, 327.)

There is no change in judgment.

Ormonde's petition for rehearing is denied.

2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B233566 |
| Plaintiff and Respondent, | (Super. Ct. No. 1349406) |
| | (Santa Barbara County) |
| v. | |
| SCOTT TOSTE ORMONDE, | |
| Defendant and Appellant. | |

Scott Toste Ormonde appeals from the judgment after conviction by jury for the sale of a controlled substance (methamphetamine) (Health & Saf. Code, § 11379, subd. (a)) for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)),[1] and street terrorism (§ 186.22, subd. (a)).  The trial court imposed and suspended a five-year prison sentence on terms and conditions including one year in county jail.

Ormonde contends his conviction must be reversed because there was not sufficient evidence to corroborate the testimony of his accomplices that he distributed methamphetamine from May through August of 2009 or that he actively participated in a street gang during that time period.  We affirm.

---

[1] All statutory references are to this code unless otherwise stated.

## FACTUAL AND PROCEDURAL HISTORY

George Arturo Chavez testified that he was a member of the West Park criminal street gang and dealt methamphetamine in 2008 and 2009. Ormonde was his supplier and also a West Park member.

Ormonde would "front" the drugs to Chavez. Chavez said he would pick up methamphetamine from Ormonde in various places, including Ormonde's home on West Pershing Street. Chavez saw other West Park members dealing with Ormonde at Ormonde's home. Chavez' profits, "[m]ostly went to them," but Chavez took home about $5,000 to $8,000 per month. Chavez said the narcotics dealing was "really all about money," and it was important to supply the gang with money. From their profits, West Park was expected to pay "taxes" to the umbrella gang, Surenos (or "Mexican Mafia"), but Chavez paid taxes only for awhile. Ormonde did not put in "hard core," work for the gang.

To avoid detection, Chavez and Ormonde used "walkie-talkie" type phones and code words. The code words made it sound "like a business." For example, Chavez would say he needed "some work" or "boxes" when he needed drugs. He would say he had "time sheets to turn in," if he had money for Ormonde. They used prepaid phones so they could not be linked to a name and they changed their phones whenever a dealer was caught. Ormonde told Chavez he should always "just get rid of" the drugs immediately and "don't have nothing on you," if caught.

Ormonde told Chavez to have someone standing ready to take over from Chavez in case of arrest, so the "money keeps coming back." Chavez named a close friend, Alejandro Negrete, to stand by. A San Diego Mexican Mafia member who was involved in the drug distribution was arrested, and Ormonde "immediately shut everything down . . . where he held drugs. Shut everything down for two weeks." When Ormonde told everyone to "shut everything down" they had to "clean up[]," which meant "wherever the house or that location was at . . . [n]o fingerprints, baggies, anything . . ." because the dealer "would be able to cooperate."

2

Ormonde never revealed his methamphetamine source to Chavez, but he always had as much as Chavez needed. Chavez testified that Ormonde and Luis Magana were "working together" and "very close."

Chavez was arrested in April 2009 with a quarter pound of methamphetamine. He had three phones with him. When Chavez testified against Ormonde, he was awaiting sentencing on federal methamphetamine trafficking charges. He faced 5 to 40 years in federal prison. There was no promise of leniency, but he hoped the U.S. Attorney would recommend a sentence of less than 5 years based on his cooperation against Ormonde.

After Chavez' arrest, Negrete took over as planned. Negrete also testified against Ormonde. Negrete was a member of West Park and had West Park tattoos. Ormonde was a West Park member in good standing. Ormonde's moniker was "Crazy Legs." Luis Magana was also a member of West Park.

Between April 2009 and August 2009, Ormonde supplied Negrete with eight to ten pounds of methamphetamine, and Negrete made $50,000 to $80,000 in profit. Ormonde "fronted" Negrete the first quarter pound of methamphetamine. They did not know each other well. Negrete picked up the drugs from Ormonde at a house on Pershing Street in a room that had a couch and television set in it. Marijuana was growing in the closet. Ormonde kept the drugs in a red tool box.

Negrete sent some of his profits to other West Park members who were in custody so they could purchase things from the commissary, buy and sell drugs, and make more money. He used the rest for "partying, cars, kids, [and] the homies."

Ormonde had a "walkie-talkie" phone and they used code words. Negrete would ask to pick up "a gasket" (an ounce), or "a pump" (a pound) and Ormonde would tell him to "show up at the shop," meaning the house on Pershing Street. Ormonde told Negrete to have a person standing by to take over if Negrete were arrested. Negrete said that Ormonde called "all of us being in prison part-timers because we come out of prison, work for a little bit, get busted selling drugs and go back to prison."

3

Negrete said that Luis Magana's twin brother, Jose, was above Ormonde in the distribution chain and sold to Ormonde. The cash went to Luis Magana, who was high in the ranks.

Negrete was arrested in August 2009 with about eight ounces of methamphetamine and a firearm. Negrete pled guilty to two felony charges. He received a lenient sentence based on his cooperation in a wiretapped phone call with another person in the organization. Later, in exchange for testimony against Ormonde and a co-defendant, the District Attorney "agreed just to make that [conviction] disappear." Negrete was released from custody and was deported to Mexico with relocation money. He returned under a visa to testify at trial.

One week before Negrete was arrested, he received a message from another member of the organization who had found a Global Positioning System (GPS) tracking device on his truck. Negrete checked his car and found one there too. Negrete said, "We stopped doing everything we were doing."

In October 2009, officers searched Ormonde's home on Pershing Street. They found a walkie-talkie type phone that contained a photograph of a GPS tracking device. In February and March of 2010, Drug Enforcement Agency (DEA) agents recorded phone calls between several people in the organization. Most were very brief and vague. Two males talked about "Scottie" getting "snitched on" and "laying low," but still having "shit." In two phone calls between Ormonde and Luis Magana, they discussed meeting in Bakersfield.

On May 6, 2010, police officers searched the Pershing Street house again. They found a room that had a couch and television set in it. Marijuana was growing in the closet. In a bedroom closet they found a "West Park 13" jersey. In a nightstand, they found a notice to Ormonde about the vehicle registration cancellation for a 1991 Honda. In a dresser, they found photos of Ormonde with West Park gang members making gang hand gestures. They did not find any narcotics, scales, packaging materials, "pay/owe" sheets, or large sums of cash. They did not find a red tool box.

4

On May 11, 2010, officers searched the home of Luis Magana in Bakersfield and found $491,520 in cash. It was packaged in envelopes and most of it was hidden in a crawl space above a child's bedroom. In the driveway was an inoperable 1991 Honda that was registered to Ormonde. The keys were in a bedroom. Only the Honda linked Ormonde to Magana's residence. Magana told officers that he did not know Ormonde to be a drug trafficker.

Magana later forfeited the money and pled guilty to possessing more than $100,000 in proceeds of methamphetamine transactions. (Health & Saf. Code, § 11370.6.) As part of his plea agreement, Magana said he had no information helpful to Ormonde's defense.

Magana testified at trial and did not directly implicate Ormonde. The court limited his examination pursuant to the 5th Amendment because he was still facing federal charges. Magana said that he and Ormonde were in touch by phone in 2009 and 2010 and that Ormonde visited him in Bakersfield. He and Ormonde had been friends since high school. He said he bought the Honda from Ormonde but had not changed the registration because it could not pass a smog check.

DEA special agent Edward Allan Talbot offered the opinion that a drug trafficking organization existed in 2009 involving Luis Magana, Jose Magana, Negrete and Chavez, and that it was linked to the West Park Gang. Santa Maria Police Detective Mark Streker testified as a gang expert and offered the opinion that Ormonde was an active member and active participant of West Park during the alleged distribution of methamphetamine. Streker said that West Park is a criminal street gang. Its primary activities include murder, drug dealing, and possessing weapons and firearms, among other things. He described prior methamphetamine selling activities by three members. He testified that in the last five years, gang members have not been openly admitting their gang affiliation. He said it is common for gang members to sell narcotics to members of rival gangs. A member can elevate his stature by helping other gang members make money. A gang will not normally allow someone who is not a member to have the gang's tattoos.

5

Ormonde testified that he did not sell drugs and was not involved in any drug trafficking organization. He was a member of West Park as a teenager, and got tattoos when he was in high school, but he was not an active member after he graduated in 1997. He served four years in the Navy after high school. He got the jersey before he went into the Navy. He forgot about it. The photos that officers found were from his youth. He and Luis Magana spoke about every two or three weeks and saw each other socially about once a year. Ormonde said he lived from paycheck to paycheck in 2008 through 2010 and his aunt had to help him pay rent. Ormonde grew marijuana in his closet for personal use and had a medical marijuana "card." He acknowledged that he had two phones. The prepaid phone was his business line for car polishing and tattooing businesses. He offered an invoice for car polishing equipment. He offered Navy records that showed he had the West Park tattoos in 1997. He offered proof of lawful employment in 2009 and 2010. He had no prior criminal record.

Three witnesses testified on Ormonde's behalf about his lack of gang activity and his frugal, family oriented lifestyle. Both said he had changed his phone numbers.

Ormonde moved to dismiss pursuant to section 1181 and moved for a new trial on the grounds that there was no independent evidence to corroborate Negrete and Chavez's testimony and that there was not sufficient evidence that Ormonde actively participated in a street gang in 2009. The court denied the motions.

DISCUSSION

*Corroborating Evidence of Drug Trafficking (§ 1111)*

Corroborating evidence, independent from accomplice testimony, reasonably tended to connect Ormonde with the commission of the charged narcotics sales.

Section 1111 provides that accomplice testimony must be corroborated by "such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Section 1111 codifies common law concerns

6

about the reliability of accomplice testimony (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303) and legislative concerns that an accomplice "is deemed to have a particularly compelling motive to lie."  (*People v. Vines* (2011) 51 Cal.4th 830, 883.)

The corroborating evidence required by section 1111 "may be slight and entitled to little consideration when standing alone.  However, it must tend to implicate the defendant by relating to an act that is an element of the crime.  It need not by itself establish every element, but must, without aid from the accomplice's testimony, tend to connect the defendant with the offense."  (*People v. Nelson* (2011) 51 Cal.4th 198, 218.) We are bound by the trier of fact's determination on the issue of corroboration "unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime."  (*Ibid.*)

Chavez's and Negrete's testimony was adequately corroborated by other evidence connecting Ormonde with narcotics sales.  Officers found a room with a couch, a television set, and marijuana growing in the closet, like the room described by Chavez where the sales took place.  Ormonde had a walkie-talkie type phone.  It was the type Chavez and Negrete said he used to set up sales transactions.  Ormonde had changed his phone, as Chavez said they did to avoid detection.  The jury rejected Ormonde's innocent explanations.  False and contradictory statements of a defendant in relation to the charge against him are themselves corroborative evidence.  (*People v. Santo* (1954) 43 Cal.2d 319, 327.)  The corroborating evidence is slight, but it tends reasonably to connect Ormonde with the narcotics sales described by Chavez and Negrete.

*Evidence to Support Conviction for Street Terrorism (§ 186.22, subd. (a))*

Ormonde's conviction for street terrorism was supported by substantial evidence.  To sustain a conviction for violation of section 186.22, subdivision (a) there must be evidence that the defendant "actively participate[d]" in a criminal street gang.[2]

---

[2] Section 186.22, subdivision (a) provides, "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in

Ormonde contends there was insufficient evidence of his participation here. But proof of "active participation," is sufficient if the evidence establishes that the defendant's involvement with the gang is "more than nominal or passive." (*People v. Castenada* (2000) 23 Cal.4th 743, 745.) It is not necessary that the defendant devote all, or a substantial part, of his time and efforts to the gang. (*Id.* at p. 752.)

Ormonde had West Park and Surenos tattoos. He acknowledged he knew about the gang and its illegal activities. Chavez and Negrete each testified that Ormonde was a member of West Park in 2009. Chavez, who was an "enforcer," testified that Ormonde had not disclaimed membership. They testified that Ormonde knew they were members when they were dealing drugs with him. Chavez and Negrete said they saw other West Park members at Ormonde's house in 2008 or 2009. Their testimony was corroborated by the West Park jersey found in Ormonde's closet in 2010, by phone calls that year linking Ormonde with other West Park members, and by Ormonde's West Park and Surenos tattoos.

That the main purpose of the drug operation was to make a profit is immaterial. It also assisted the gang. Chavez explained that the main purpose was to make a profit because it was important to supply the gang with money. Younger members fought and "tagged," while more senior members sold drugs and made money.

That people were involved who were not West Park members, is also immaterial. Chavez testified that some of his subdealers were members of Northwest, an "enemy," but they all claimed under Surenos and, "when it came to dealing drugs and money," West Park would supply Northwest. The gang expert testified that this was not an uncommon practice among rival gangs.

It was within the jury's purview to reject Ormonde's explanation that he was no longer a West Park member, that he forgot about the jersey, that he intended to

---

any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

have his gang tattoos removed, and that he associated with West Park members only because they were his friends.  We will not disturb the jury's credibility findings.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

GILBERT, P.J.

We concur:

YEGAN, J.

PERREN, J.

Kay S. Kuns, Judge

Superior Court County of Santa Barbara

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Tita Nguyen, Deputy Attorney General, for Plaintiff and Respondent.