Filed 4/12/16  P. v. Richardson CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B257256 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA124551) |
| v. | |
| LAMAR RICHARDSON et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick Connolly, Judge.  Affirmed.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant Lamar Richardson.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant Warren Howard.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Tita Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

_____

Around midnight on August 18, 2012, four members of the 8-7 Gangster Crips gang, Cornelius Tyson (Tyson), Warren Howard (Howard), Lamar Richardson (Richardson), and Travon Wise (Wise), met near the Avalon Gardens housing development, located within the territory of a rival gang, the Avalon Garden Crips. While Wise and Tyson waited outside, Howard and Richardson entered Avalon Gardens, shot at unarmed D.B. and his friend, and chased them while still shooting. D.B. ran into his apartment, collapsed and subsequently died from the gunshot wounds. Ten-year-old A.V. lived in the same apartment; Howard fired a shot that hit the child's side.

A jury convicted Richardson and Howard of first degree murder and further found true the allegation that they each committed the crime for the benefit of a gang and that a principal personally used a firearm during the commission of the crime. The jury also convicted Howard of first degree burglary and assault with a firearm and further found true the allegation that he committed both crimes for the benefit of a gang and that he personally used a firearm during the commission of the assault with a firearm offense.

On appeal, Richardson alleges there was not substantial evidence for his conviction of first degree murder and that he received ineffective assistance of counsel. Howard argues the trial court should not have admitted into evidence certain testimony from the prosecution's gang expert, the trial court's sentence violated Penal Code section 654,[1] and the trial court failed to provide a jury instruction on the lesser included offense of attempted burglary. We affirm the trial court's judgment on all issues.

## BACKGROUND

After midnight on August 19, 2012, victims D.B. and A.V. suffered gunshots. The shooting occurred in the Avalon Gardens housing development after D.B., A.V., and their relatives had enjoyed a family barbeque. D.B. (in his 40s) died of the multiple gunshot wounds; 10-year-old A.V. survived. There were at least four witnesses to the shootings:

---

[1] All further statutory references are to the Penal Code.

J.A. (the girlfriend of D.B. and aunt of A.V.), M.A. (the brother to J.A. and uncle to A.V.), the victim A.V., and Tyson.

Tyson, Richardson, Howard, and Wise are members of the 8-7 Gangster Crips gang; they each have various gang monikers and aliases. The 8-7 Gangster Crips is a rival gang of the Avalon Garden Crips, who control the Avalon Gardens housing development.

Around midnight, Tyson was at home when he received a call from Howard. Howard told Tyson that an Avalon Garden Crips gang member had called him with a taunt to "come out and play." This phrase means the Avalon Garden Crips challenged the 8-7 Gangster Crips to a violent altercation. Howard threatened Tyson that their fellow 8-7 Gangster Crips gang members would discipline him with physical violence if he did not come outside. Tyson left his house with a .38-caliber revolver handgun; it is unclear whether Tyson openly displayed the handgun while walking.

Tyson, Howard, Richardson, and Wise met near the Avalon Gardens housing development. Howard carried a nine-millimeter semiautomatic handgun; Richardson carried a revolver. The four gang members discussed their plan to "walk over there [Avalon Gardens] and just start shooting." Then Wise said, "Let's start doing this" and "Are we ready to go? Are we ready to go?" And Richardson responded, "I'm ready, Cuz."

The four gang members went to the rival gang territory. While Wise went into an alley and Tyson waited across the street, Howard and Richardson entered Avalon Gardens; upon arrival, Howard yelled, "AK, Cuz. This is Tiny Bone, 8-7 Gangsters." "AK" stands for Avalon killer. Howard and Richardson walked around and eventually saw D.B. and his friend. First Howard and then Richardson started shooting at them. As D.B. ran toward his apartment, Howard and Richardson chased after him still shooting. When the shooting stopped, Howard and Richardson walked back to the exit. Howard accidentally shot Richardson in the leg and then assisted a limping Richardson by supporting him on Howard's shoulder; Wise drove him to the hospital.

3

When witness J.A. heard the gunshots, she was inside the apartment in her bedroom, which she shared with her boyfriend D.B. She saw Howard running toward the apartment while shooting a gun and Richardson crouched near some cars near the apartment. In response to the shooting, she ran outside looking for D.B. D.B. pushed her back into the apartment and said, "They got me. They got me." J.A. asked whether the shooters had said anything; D.B. responded, "No, they just started shooting" and then collapsed. J.A. observed Howard running toward Richardson and heard Howard say, "Come on, let's go. We got them." She subsequently saw Howard helping Richardson run toward the exit.

Before the shooting, witness M.A. had seen D.B. outside the apartment with about 10 Avalon Garden Crips gang members. When the shooting began, M.A. was inside the apartment that he shared with J.A. and D.B.; M.A. heard shots from two different guns. He saw victim D.B. run into the apartment and then watched Howard run up to the front door and shoot into the apartment at D.B. He heard D.B. say, "Baby, they got me. They got me."

Ten-year-old victim A.V. was in the same apartment when he heard the gunshots. He had walked into the kitchen to get a glass of milk before bed and was returning down the hallway to his bedroom. He saw D.B. run into the apartment and toward D.B. and J.A.'s bedroom. He also observed Howard run into the apartment after D.B., fire his gun several times, and hide behind a wall. A.V. was in the hallway when Howard fired a shot that hit the child's side.

Officer Samuel Marullo responded to a 911 call made at 12:48 a.m. on August 19, 2012, regarding a shooting at the Avalon Gardens housing development. While inspecting the crime scene, he learned that someone at a local hospital was seeking treatment for a gunshot wound and had identified himself as "Frank Harris." Officer Marullo knew, however, that Frank Harris is a member of the 8-7 Gangster Crips serving a life sentence for murdering an Avalon Garden Crips gang member. He went to the hospital to investigate and found Richardson there.

4

During their investigation, the police found a trail of blood outside the apartment; DNA analysis matched the blood to Richardson. Officers also discovered evidence of gunshots (bullet holes, bullet projectiles, etc.) both outside and inside the apartment; based on the evidence, at trial, an expert on firearms concluded that the cartridge casings, bullet jacket, and fired bullets came from the same gun. Video surveillance footage showed Tyson, Howard, Richardson, and Wise near the Avalon Gardens housing development, and both Howard and Richardson entering the development.

Howard's girlfriend testified that she had dropped Howard off a block from the same intersection where he and the other three gang members met before going into the Avalon Gardens housing development. Howard told her that he had a ride home; she did not see him until the next morning. After the police arrested Howard, he told his girlfriend to get rid of his clothing, to delete his Facebook accounts, and to be his alibi. He also asked her whether she had found the gun.

After Richardson's arrest, he spoke to an unidentified person by phone. That person said he wished Richardson had not gone to Avalon Gardens; Richardson responded, "But you know how I am with the hood, though, my nigger. [¶] . . . [¶] . . . It's like, man, nigger, so much it's more than addicted to this shit; it's like a drug, man."

On May 9, 2013, the People filed an information charging Richardson and Howard with the first degree premeditated murder of D.B. (count 1), the attempted willful, deliberate, and premeditated murder of A.V. (count 2), and first degree burglary (count 3). The information also alleged that the defendants personally discharged a firearm and that a principal personally discharged a firearm. The information further alleged that they committed these offenses for the benefit of a gang. The trial court subsequently dismissed the charge of attempted murder (count 2) and added the charge of assault with a deadly weapon (count 5).[2]

---

[2] Count 4 concerned defendant Renikki Washington.

On May 21, 2014, a jury convicted Richardson and Howard of first degree murder (count 1) and further found true the allegation that they each committed the crime for the benefit of a gang and that a principal personally used a firearm during the commission of the crime. The jury also convicted Howard of first degree burglary (count 3) and assault with a firearm (count 5) and further found true the allegation that he committed both crimes for the benefit of a gang and that he personally used a firearm during the commission of the assault with a firearm offense.

On June 26, 2014, the trial court sentenced Richardson to 25 years to life on count 1 for first degree murder; in light of a prior strike, the court doubled the term to 50 years to life. The court imposed an additional term of 25 years for a firearm enhancement and five years for a prior felony enhancement. On count 1, the trial court sentenced Howard to 25 years to life for the substantive crime and a second term of 25 years to life for his use of a firearm. The court imposed and stayed a term of 15 years under the gang enhancement statute. On count 3, Howard's sentence is the upper term of six years; the trial court ordered this sentence to run concurrently to the sentence imposed on count 1. On count 5, the court sentenced him to the upper term of four years, enhanced by 10 years under section 12022.5, subdivision (a), plus five years under section 186.22, subdivision (b).

## DISCUSSION

### I.  Richardson's appeal

A jury convicted Richardson for first degree murder as an aider and abettor. An aider and abettor is one who acts with both "knowledge of the criminal purpose of the perpetrator" and "an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) When the offense charged is a specific intent crime such as first degree murder, the aider and abettor must share the perpetrator's specific intent, knowing "the full extent of the perpetrator's criminal purpose" and giving "aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Ibid.*) In other

6

words, the aider and abettor "must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

Richardson argues there is not substantial evidence to show he knew Howard intended to kill "random strangers" such as victim D.B. He argues the sole evidence of his intent came from Tyson's testimony that Richardson carried a gun and fired a gun at D.B. He subsequently argues that no evidence corroborates Tyson's testimony, that evidence contradicts Tyson's testimony, and that therefore Tyson's testimony cannot be substantial evidence to support his conviction.

First, in addition to Tyson's testimony, a gang expert testified on why gang members intentionally shoot random strangers on rival gang territory: gang members see such violence and crimes as contributions to and loyalty with their gang and its mission to strike fear in the community—especially when committed with other gang members as part of a group effort. He also testified that the 8-7 Gangster Crips are well-known for such violence and crime. Also, witness J.A.'s testimony demonstrates that Richardson and Howard shared the same mission, such as Richardson's following at a close distance behind Howard as his back up, Howard's speaking to Richardson after they shot the victims as if they had planned that mission and successfully achieved that objective together, and Howard's helping Richardson when he had an injury even though that act risked Howard getting caught. A third witness M.A.'s testimony that he heard gunshots from two separate guns supports an inference that Richardson also had a gun and also shot at the victims. Thus, there was substantial evidence other than Tyson's testimony showing Richardson's intent.

Second, we can use contradicted evidence to determine whether substantial evidence supports a conviction, as long as the evidence is reasonable, credible, and of solid value. (*People v. Cooke* (1993) 16 Cal.App.4th 1361, 1372.) We must "view the evidence in a light most favorable to the judgment below" and "presume in support of that judgment 'the existence of every fact the trier could reasonably deduce from the evidence.'" (*Id.* at pp. 1371–1372.) Further, corroborating evidence need not corroborate every fact to which an accomplice testifies or by itself establish every

7

element of the crime. (*People v. Santo* (1954) 43 Cal.2d 319, 327; *People v. Nelson* (2011) 51 Cal.4th 198, 218.) It is sufficient that the evidence tends in some degree to implicate the defendant or "'tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'" (*Santo*, at p. 327; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303–304.)

Tyson testified to a chain of events, starting with Howard receiving a taunt from a rival gang member and the four fellow gang members immediately plotting a mission to "just start shooting" on rival gang territory, and ending with Howard and Richardson entering the rival gang territory with guns, announcing their gang affiliation, shooting at an unarmed person, and then helping one another flee the crime scene. This testimony from Richardson's accomplice and fellow gang member is reasonable, credible, and of solid value.

The following evidence corroborated Tyson's testimony: the testimony from witnesses J.A. and M.A. described above, the physical evidence placing Richardson at the scene of the crime, Richardson's own recorded statements that his role in the crimes stemmed from his addiction to his life as a gang member, the testimony from the officer who found Richardson being treated for a gunshot wound, and Richardson's attempt to conceal his involvement in the crime, which implies a consciousness of guilt. Even Richardson admits he knew a rival gang member called Howard taunting him, he knew Howard was bringing a gun into that rival gang's territory after midnight, and he knew Howard intended to confront rival gang members.

Richardson relies on a Ninth Circuit case with facts very different than the facts in this case. (See *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262.) The primary evidence of motive in *Juan H.* was the defendant's gang gestures during the *months* before the shootings. (*Id.* at p. 1278.) In this case, Howard's receipt of a taunting call from an Avalon Gardens Crips gang member triggered Howard into action: he *immediately* gathered his fellow gang members to plot a response. At the meeting, Richardson and Howard expressly announced their intention to shoot random strangers and *thereafter the group promptly* went armed into rival gang territory to do so. Upon arrival at the Avalon

8

Gardens housing development, Howard announced their gang moniker and his intention to kill, which Richardson likely heard in light of his proximity to Howard. Thus, considerable evidence demonstrates that Richardson's motive to kill came from his gang involvement.

Further, in *Juan H. v. Allen*, *supra*, 408 F.3d 1262, the only evidence of Juan H.'s knowledge of the perpetrator's intent was that he knew the perpetrator carried a gun and was ready to confront the two victims if threatened; in addition, when the perpetuator confronted the victims, Juan H. stood unarmed behind him. (*Id.* at p. 1278.) In this case, as they discussed it beforehand and Howard announced it upon arrival at the Avalon Gardens housing development, Richardson knew Howard's intent; further, Howard not only had a semiautomatic firearm but Richardson also had a gun and shot at the victims.

In *Juan H. v. Allen*, *supra*, 408 F.3d 1262, there was no evidence that the defendant intended to assist the perpetrator. (*Id*. at p. 1278.) In this case, Richardson acted as Howard's back up by bringing a gun to add deadly force to their mission and to protect him by following behind him and shooting at the victims when Howard did. After the shootings, Howard's statements to Richardson implied that they had accomplished their common mission. Howard and Richardson not only left together but Howard helped Richardson escape at the risk of getting caught himself. In contrast, the flight from the crime scene in *Juan H.* involved Juan H. and the perpetrator fleeing separately. (*Id.* at p. 1277.)

Therefore, substantial evidence supports a conclusion that Richardson had the same murderous intent as Howard: Howard and Richardson planned to shoot whomever they saw on rival gang territory and to help one another do so. As we reject Richardson's lack of substantial evidence argument, we also reject his related ineffective counsel argument.

## II.  Howard's appeal

### A.  *The testimony from the prosecutor's gang expert*

Section 186.22 prohibits active participation in a criminal street gang and permits a sentence enhancement when a defendant commits a crime "for the benefit of, at the

9

direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." The California Supreme Court explained that expert opinion on whether criminal conduct benefited a gang is not only permissible but can be sufficient to support a section 186.22 sentence enhancement. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) But, while a gang expert generally should not testify on whether the *specific defendant on trial* committed a crime for the benefit of a gang, that expert can—and should—testify about his or her opinion regarding a *hypothetical person* in a hypothetical scenario based on evidence produced at trial. (*Id.* at pp. 1041, 1047–1049.) A prosecutor may ask an expert to imagine a hypothetical scenario mirroring the facts shown by the evidence presented at trial and then ask whether a hypothetical person in that hypothetical scenario committed a crime for the benefit of a gang. (*Ibid.*)

The prosecutor in this case described a lengthy hypothetical scenario mirroring the facts shown by the evidence of this case and asked the gang expert: "Do you have an opinion as to whether the crimes outlined in the hypothetical were committed for the benefit of, at the direction of, or in association with a criminal street gang." While the prosecutor did not identify any defendant by name but used pseudonyms such as Suspect 1, Suspect 2, Suspect 3, and Suspect 4, he said in laying out the hypothetical: "Suspect 2 then claimed his moniker and gang, 8-7 Gangsters, Infant Loc, Tiny Bone, and walked into a playground area."[3]

Howard alleges that the prosecutor's use of his gang moniker "Tiny Bone" identified him by name and took the question outside the realm of a hypothetical. Indeed, as the expert had revealed earlier that Howard's game moniker is Tiny Bone, the prosecutor came perilously close to tainting the trial with such a question. Nevertheless, as Howard's counsel failed to object when the prosecutor asked the improper question, he

_____

[3] In response to the hypothetical, the expert did not identify any defendant by name but used the pseudonym Suspect No. 2.

10

effectively admits that he has forfeited this issue. Thus, he resorts on appeal to raising an ineffective assistance of counsel claim.

In analyzing a claim alleging ineffective assistance of counsel, the United States Supreme Court explained that the defendant must show the legal representation "fell below an objective standard of reasonableness." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.) There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id.* at p. 689.) Our review is "highly deferential" to the counsel's performance. (*Ibid.*) The defendant must also show the counsel's representation prejudiced his case, which requires a showing of a reasonable probability that "but for" counsel's failings, defendant would have obtained a more favorable result. (*Id.* at pp. 692, 694.)

A volume of other evidence at trial showed that Howard committed the crime for the benefit of his gang, such as the following: (1) Howard's tattoos and Facebook postings showing his membership in the 8-7 Gangster Crips gang and his loyalty to them; (2) multiple expert and fact witness testimony that the 8-7 Gangster Crips and Avalon Garden Crips are rival gangs, that the Avalon Gardens housing development is in the latter gang's territory, and that Howard shot D.B. and chased after him there; (3) the testimony from Tyson regarding Howard's statements on the day of the crime explaining the impetus for the shooting as a taunt from a rival gang, discussing with his fellow gang members their intent to "just start shooting" on rival gang territory, and loudly announcing his gang affiliation before shooting the victims; (4) the video surveillance of Howard at the crime scene with his fellow gang members; and (5) Howard's own statements implying a consciousness of guilt when he asked his girlfriend to lie and destroy evidence for him. Further, the prosecutor's reference to Tiny Bone was brief and at the end of a lengthy hypothetical. Given the evidence, it is not reasonably probable that Howard would have obtained a more favorable result if his counsel had made an objection to the prosecutor's improper question, and therefore the improper question did not prejudice Howard's case; we reject Howard's ineffective assistance of counsel claim.

## B.    Section 654

The trial court sentenced Howard to concurrent terms for his murder and burglary convictions; the trial court explained that he "fired multiple times into that location to ensure that the victim of count 1 [D.B.] was deceased, and in doing so shot a child [A.V.] that was in there."  On appeal, he alleges that section 654 prohibits the trial court from imposing multiple punishments.

Section 654 mandates the following:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  The statute prohibits a court from imposing multiple punishments for the same act even though the same act may violate multiple criminal statutes.  When a defendant's actions are a course of criminal conduct, to determine whether section 654 precludes multiple punishments the test is to look at the defendant's criminal objective and intent.  (See *People v. Beamon* (1973) 8 Cal.3d 625, 638–639.)  When the defendant had multiple criminal objectives independent of each other and not merely incidental to each other, the course of conduct is divisible into separate acts such that the court may punish the defendant for each violation committed in pursuit of an independent criminal objective.  (See *id.* at p. 639.)

The multiple victim exception is a well-settled rule that section 654 does not apply to crimes of violence against multiple victims.  (*Neal v. State of California* (1960) 55 Cal.2d 11, 20–21.)  As section 654 "is to [e]nsure that the defendant's punishment will be commensurate with his criminal liability," one who commits an act of violence "by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person."  (*Id.* at p. 20.)

Howard alleges he had a single criminal objective:  to kill D.B.  But he fired a semiautomatic multiple times into a residence filled with people at night, which is an act of violence likely to cause harm to several persons.  Indeed, Howard's actions harmed two people; he killed D.B. and seriously injured A.V.  Thus, the trial court appropriately imposed separate punishments for the harms that Howard committed against each victim.

12

*C.* ***A jury instruction on the lesser included offense of attempted burglary***

The trial court provided a jury instruction on the offense of burglary. At trial, Howard did not seek a jury instruction on the lesser included offense of attempted burglary; on appeal, he alleges that the trial court should have sua sponte provided that instruction to the jury.

The test for such a sua sponte instruction is whether "evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Substantial evidence in this context means evidence from which a jury composed of reasonable persons could conclude that the defendant committed the lesser offense but that the defendant did not commit the greater offense. (*Ibid.*)

There is conflicting evidence regarding the extent to which Howard entered the apartment. The victim A.V. testified that Howard ran inside the apartment, shot four times at his uncle D.B., and hid behind a wall inside the apartment. Another witness, however, testified that Howard stood at the frame of the door and extended his arm while shooting at the victims inside the apartment. Nevertheless, even under Howard's version of the events, entry into the apartment by an arm or even merely a shooting gun is sufficient for burglary. (*People v. Allison* (1927) 200 Cal. 404, 407–408.) Thus, the trial court had no obligation to provide sua sponte the instruction on attempted burglary.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

ROTHSCHILD, P. J.          CHANEY, J.

13