Filed 10/25/24  P. v. Martinez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RUBEN CRUZ, et al.,<br><br>    Defendants and Appellants. | H047687<br>(Santa Clara County<br> Super. Ct. No. 213441) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGEL KIKO MARTINEZ,<br><br>    Defendant and Appellant. | H047386<br>(Santa Clara County<br> Super. Ct. No. 213441) |

In May 2013, the Santa Clara County grand jury returned a 77-count indictment against 48 defendants associated with the Nuestra Familia (NF) organization.  Angel Kiko Martinez, Josef Ryan Oakes, and Ruben Cruz (defendants) were subsequently convicted of murder, participation in a criminal street gang, and other crimes.  Defendants appeal, asserting an impermissible pretrial identification, uncorroborated accomplice testimony, and other trial errors.  Defendants contend that their convictions for participating in a street gang as well as various gang-related special circumstances

and enhancements should be vacated in light of recent ameliorative changes in the criminal gang statute.

As explained below, we conclude that there was no error at trial but that defendants' convictions for gang participation, gang-related special circumstances and gang-related enhancements should be vacated in light of intervening changes in the criminal street gang statute. We therefore reverse the judgments against defendants and remand for further proceedings.

## I. BACKGROUND

The facts recited below are derived from the trial record.

### A. The NF Organization

According to testimony of a police department expert, the NF organization has its origins in California state prisons in the 1950s. Since then, the NF has expanded beyond state prisons and now has over 10,000 members in California involved in criminal activities, including murder, assault, drug distribution, and kidnapping.

The NF organization has multiple layers. At the top are NF members, who are committed to the organization for life. Below the NF members are Nuestra Raza members, who are committed while they are in jail but free to leave once released. Below the Nuestra Raza members are Norteño gang members, often called "Northerners," and, finally, associates. Street-level gang members and associates are organized into regiments, which are led by a regiment commander who reports to an NF member in prison. The NF organization also has a federal side, but the state side is supposed to control operations outside the prisons.

During the events in question in this case, defendant Martinez was a Nuestra Raza member. In January 2012, he became second in command of the NF's Santa Clara County regiment, and in July 2012 leader of the regiment. Defendant Oakes was at least a Northerner, and defendant Cruz was an NF associate.

2

## B. The Nightclub Shooting

On January 11, 2012, Martinez attended a rap concert at a San Jose nightclub with his friend J.C. and two gang members: L.B., Martinez's predecessor as second in command of the Santa Clara County regiment, and R.P., an NF associate. A fight involving L.B. and R.P. broke out, and, waving a gun, J.C. led Martinez, L.B., and R.P. out to the parking lot. In the parking lot, someone charged at them, and J.C. fired his gun. When the police arrived, they found an individual who had been shot in his hip.

## C. The Chacon Murder

On August 13, 2012, Martin Chacon, who was associated with the federal prison side of the NF organization, was executed. At approximately 1:30 p.m., Chacon arrived in an industrial area of San Jose driving a white Impala. He parked behind a black Honda, and the driver of the Honda walked to Chacon's car and sat in the front passenger seat for several minutes before returning to the Honda. Afterwards, another person left the Honda, approached the driver's side of Chacon's car and shot Chacon twice, once in the face and then in the chest area. Next, a third person from the Honda went to Chacon's car and shot Chacon in the back of the neck, killing him.[1]

## D. The Trial Court Proceedings

### 1. The Indictment

On May 31, 2013, the Santa Clara County grand jury indicted Martinez, Cruz, Oakes, and 45 others. Martinez, Cruz, and Oakes were charged with participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)); count 1) and with the murder of Martin Chacon (Pen. Code, § 187; count 5).[2] In connection with the nightclub shooting Martinez was charged with two counts of attempted murder (§§ 664, subd. (a), 187; counts 6 and 8) and two counts of assault with a firearm (§ 245, subd. (a)(2);

---

[1] Although Martinez was convicted of several drug offenses, those offenses are not at issue on appeal and are not discussed.

[2] Subsequent undesignated statutory references are to the Penal Code.

3

counts 7 and 9). Finally, the indictment charged Martinez with conspiracy to sell methamphetamine (§ 182, subd. (a)(1), Health & Saf. Code, § 11379; count 2); conspiracy to sell cocaine (§ 182, subd. (a)(1), Health & Saf. Code § 11352; count 3); and two counts of selling methamphetamine (Health & Saf. Code, § 11379, subd. (a); counts 46 and 47).

The indictment also alleged a gang-related special circumstance in connection with the Chacon murder, as well as gang enhancements on nine counts (§ 186.22, subd. (b)) and gang-related firearm enhancements on two counts (§ 12022.53, subd. (c), (d)(1), (e)).

### 2. *The Motion in Limine*

Before trial, Oakes moved to exclude identification testimony by K.V., a delivery man, who was on the scene when Chacon was killed, on the ground that the photo lineup was unduly suggestive and tainted any subsequent identification by K.V. The trial court denied the motion.

### 3. *Evidence Concerning the Chacon Murder*

At trial, the prosecution presented evidence that Martin Chacon was murdered on August 13, 2012, that he was shot by Oakes and Cruz who had driven down from Red Bluff with a federal NF member to commit the murder, and that Martinez participated in the crime.

Police officers testified that around 1:40 p.m. on August 13, 2012 they received a report of a shooting on Oakland Road, and upon arrival they found Chacon dead in a white Impala. The front driver's side window of the car was shattered, and Chacon had gunshot wounds on his left cheek, the back of his head, and his left rear shoulder. Two 9-millimeter Luger shell casings were found outside the vehicle, and a .25 caliber shell casing was on the front passenger seat. Based on Chacon's wounds, a forensic pathologist testified that he was shot three times, through the driver's side window in the face and in the chest and directly in the neck. Another expert testified that the blood

4

stains in the car were consistent with one person shooting Chacon twice through the driver's side window, and another person shooting him in the neck through the then-shattered window.

Surveillance video from businesses in the area showed a black four-door sedan and a 2000s-era Chevrolet extended cab pickup truck turn onto Charles Street near Oakland Road around 1:00 p.m. A witness, J.O., saw three men in the Honda. At 1:24 p.m., a white Impala arrived and parked on Charles Street. At 1:31 p.m. there was a flash. After hearing two gunshots, another witness—the delivery man K.V—saw a man whom he identified as defendant Oakes, pointing a black semi-automatic weapon at the driver's side window of the Impala. K.V. also saw another, smaller man carrying a chrome pistol running towards the Impala. At 1:34 p.m., three minutes after the flash, the black sedan left the area.

Alberto Larez ("Bird"), a federal NF member from Red Bluff, which is in the northern part of the state near Chico, owned a black Honda, which police later found near Oakes' apartment with Oakes' identification inside. In addition, cellphone records showed that early in the morning of August 13, 2012 Larez and Oakes drove from Red Bluff to San Jose. During the drive, Larez called Chacon five times. At 1:20 p.m., Larez again telephoned Chacon, who by that time was near Larez in the area of Oakland Road. By 2:07 p.m. the cellphone data showed that Larez and Oakes had left San Jose and were in Pleasanton, and from there Larez traveled north through Fairfield and was back in Red Bluff by 5:30 p.m.

Although the prosecution was unable to obtain Cruz's telephone records, Oakes' records showed that he called Cruz several times before 7:00 a.m. on the morning of Chacon's murder and several times after 7:00 p.m. that evening, which is consistent with Cruz accompanying Larez and Oakes to San Jose on the day of Chacon's murder. In addition, K.V., who identified Oakes as the man who first shot Chacon, described the smaller man with the chrome pistol as Hispanic with a dark complexion, dark hair, and in

5

his mid- or late 20s. J.O.—the second witness at the scene—similarly described the man in the rear of the black Honda as a younger Hispanic man, around 5 feet 7 inches tall and about 140 or 150 pounds. The prosecutor argued that Cruz, who was present at trial, fit this description.

The prosecution also presented evidence that Martinez was involved in Chacon's murder. Larez's phone records showed that in the period surrounding Chacon's murder, he had 60 calls with Martinez, including one made at 10:41 a.m. the morning of the murder while he was driving from Red Bluff to San Jose. In addition, as noted above, surveillance video showed a white Chevrolet extended cab pickup truck driving down Charles Street shortly before the murder around 1:00 p.m. When police executed a search warrant at Martinez's house, they found his wife driving a gray Chevrolet pickup truck.

The prosecution presented evidence as well that Martinez had a motive for murdering Chacon. L.B. testified that Martinez had complained about Chacon collecting NF taxes in Santa Clara County. The NF Organization requires 25 percent of the proceeds of members' criminal activities to go to the organization. In addition, each Norteño street regiment pays a "hood tax," which provides funds to incarcerated NF members. These taxes are typically collected by state, not federal, members. As a consequence, Martinez believed that Chacon, who was associated with the federal side of the NF organization, was acting without authority. L.B. agreed and told an associate of Chacon that Chacon "might get smacked," or killed, for doing so. Martinez also believed that a woman Chacon had been dating was an informant. According to the prosecution's gang expert, both sleeping with an informant and collecting taxes without authority were offenses for which the NF organization would impose severe discipline, including death.

Finally, the prosecution presented testimony from Martinez' friend J.C. cementing together the other evidence concerning the Chacon murder. J.C. testified that Martinez considered himself to be the boss of San Jose and that Martinez was upset because

6

Chacon, who was known as "Kung Fu," was claiming to be the boss and was collecting taxes on the south side of the city. Martinez also believed that Chacon was dating a federal informant and reported this to Larez.

J.C. further testified that Martinez participated in Chacon's murder. On August 13, 2012, the day of the murder, Martinez picked up J.C. in his gray truck. With his fingers mimicking a gun, Martinez said "Kung Fu," which J.C. understood to mean that Chacon was going to be shot. Martinez drove to a parking lot, where he met with Larez, Oakes, and Cruz who were in a black Honda. At the meeting Larez said that "they was gonna kill Kung Fu."

J.C. continued that, after conferring with Martinez about possible locations and giving directions to someone over the phone, Larez told Martinez, "[h]e's coming over." Larez and Martinez then drove to Oakland Road where Larez told Martinez to be on the lookout for an Impala. A white Impala arrived 10 to 15 minutes later and parked behind Larez's Honda. Larez went to the front passenger seat of the Impala for several minutes and then walked back to the Honda. After Larez left the Impala, Oakes approached the driver's side window. Martinez said "[i]t's gonna happen," and J.C. heard a gunshot. When J.C. looked up, he saw Oakes with a black semi-automatic gun, a hole the driver's side window, and Chacon slouched over. As Martinez was driving away, J.C. saw Cruz go into the backseat. Afterwards, Martinez told J.C. that what had just happened was a "mob hit."

### 4. Evidence Concerning the Nightclub Shooting

With respect to the nightclub shooting, the prosecution presented a witness, V.S., who testified that during a rap concert at the Creekside Bar and Grill in San Jose on January 11, 2012 a fight broke out on the dance floor. A man, later identified as J.C., came into the club waving a gun and told people to "get the fuck back." V.S. later heard gun shots, and police arriving at the scene found an individual who had been shot.

7

The prosecution also presented testimony from J.C., L.B., and a Nuestra Raza member named A.V. J.C. testified that he and Martinez went to the nightclub on January 11, 2012, where L.B. and R.P., another gang member, met them. J.C. brought a gun, which Martinez wanted J.C. to carry because J.C. did not have a prison record. Inside the club, a fight involving L.B. broke out, and J.C. pulled out his gun. J.C. used the gun to wave people out of the way, and J.C., Martinez, L.B., and R.P. went to the parking lot. In the parking lot, a man charged at them, and Martinez told J.C., "Shoot him. Shoot him." J.C. again pulled out his gun and shot twice at the person charging at them. J.C. testified that after the shooting, he and Martinez drove to A.V.'s house.

L.B. similarly testified that he went to the nightclub with R.P., where they met with Martinez and J.C. When L.B. and R.P. were out on the dance floor, someone hit L.B. on the back of the head with a bottle, and L.B. hit the person in front of him, whom R.P. also stabbed. L.B. heard Martinez say "get the gun," and J.C. put himself between L.B. and the rest of the crowd, waving a small .22 caliber gun. Outside, L.B. heard Martinez say, "Shoot them fools, blood, shoot them fools," and J.C. fired a shot in the direction of a group of men who appeared to be approaching. L.B. then went to A.V.'s house where he heard Martinez brag that "we shot them fools."

A.V., a Nuestra Raza member who helped the NF organization by supplying guns and drugs, testified that at some unspecified time he exchanged a .22 caliber gun, which was easy to hide, for a .38 caliber gun that J.C. had been carrying. A.V. also testified that early in the morning on the night of January 11, 2012, Martinez, J.C., L.B., and R.P. came to his house, hyped up as if they had been in a fight. J.C. told A.V. that he (J.C.) had pulled out a gun, which he fired after Martinez said "[s]hoot, shoot." A.V. testified that Martinez agreed with J.C.'s account.

### 5. *Evidence Concerning the NF Organization*

The prosecution presented testimony from an expert on the NF. In addition to testifying concerning the NF's organization, its tax system, and various individuals'

8

associations with the organization, the expert testified that the NF had engaged in a pattern of criminal gang activity based on records of four criminal convictions committed by individuals associated with NF. The first record was a 2000 conviction of an NF member for murder. The second was a 2006 conviction of Martinez's brother, then a Nuestra Raza member, for conspiring to sell methamphetamine and being a felon in possession of ammunition. The third was a 2012 conviction of an NF member for conspiracy to sell methamphetamine and other offenses. The fourth was the conviction of an "NF associate" for conspiracy to sell methamphetamine and being a felon in possession of a firearm and ammunition.

### 6. *Verdict and Sentencing*

In the middle of the trial, on the prosecution's motion, the trial court dismissed one count of attempted murder and one count of assault with a firearm relating to the nightclub shooting. On March 13, 2019, the jury found Martinez, Oakes, and Cruz guilty on all remaining counts and found true all conduct allegations and the special circumstance.

On September 20, 2019, the trial court sentenced Martinez to life without parole, consecutive to 169 years to life, consecutive to 35 years in prison. The trial court also sentenced Cruz to life without the possibility of parole, consecutive to 25 years to life, consecutive to three years in prison, and Oakes to life without parole, consecutive to 25 years to life, consecutive to 2 years.

## D. The Appeals

Martinez, Cruz, and Oakes all filed timely notices of appeal. The appeals by Cruz and Oakes were placed in Case No. H047687, and Martinez's appeal in Case No. H047386. The court granted the Attorney General's motion to consider Martinez's appeal together with the appeals by Cruz and Oakes for briefing, oral argument, and disposition.

9

## II.  DISCUSSION

Defendants raise an assortment of issues on appeal.  Oakes challenges the admission of the identification of him by K.V., the delivery man on Oakland Road when Martin Chacon was murdered.  Martinez and Cruz challenge accomplice testimony presented against them.  All three defendants challenge their convictions for participating in a criminal street gang and the gang-related enhancements and special circumstances found by the jury.  Cruz also challenges his conviction on several additional grounds, and defendants challenge several aspects of their sentences.  We address each of these issues in turn.

### A.  The Pre-Trial Identification of Oakes

Before trial, Oakes moved to exclude the identification testimony of K.V., a delivery man who was on Oakland Road when Martin Chacon was shot, on the ground that a pre-trial photo lineup was unduly suggestive.  Oakes argues that the trial court erred in denying his motion because both the photo of Oakes shown to K.V. and the administration of the lineup were unduly suggestive.  Conducting an independent review (*People v. Vivar* (2021) 11 Cal.5th 510, 527; *People v. Holmes, McLain and Newborn* (2022) 12 Cal.5th 719, 746 (*Holmes*)), we conclude that the photo lineup was not unduly suggestive.

### 1.  The Photo Lineup

In March 2013, approximately seven months after the Chacon murder, K.V. participated in a photo lineup with two San Jose police officers.  Consistent with his department's "double-blind" method, the officer who took the primary role in administering the photo lineup knew nothing about the case and in particular did not know Oakes was the suspect or which photo was of him.  However, in an admitted departure from best practices, a second officer, who sat in the back of the vehicle where the lineup was administered, was aware that Oakes was a suspect.

10

The lineup consisted of a photo of Oakes as well as individual photos of five "fillers" selected from a Department of Motor Vehicles database. Oakes was depicted in photo 4. The administering officer advised K.V. that the suspect might not be shown and that the photos would be shown one at a time. The officer then presented the photos to K.V., one at a time, four times.

The first time through K.V. did not identify anyone. During the second time, looking at photo 4, he said "It's between uh . . . . Can I see the other one again too? I think it was the second one before this one." The administering officer responded, "Okay, we'll have to go through them all again."

In addition, pursuant to his ordinary practice, the administering officer asked K.V. about his reaction to photo 4. Noting that "[t]here was something about this photo that you kind of paused a little bit," the officer asked, "What was it about this photo that you kind of paused?" K.V. replied that photo 4 "resembles what I remember seeing . . . ." After confirming that photo 4 resembled the person he saw, K.V. asked "can I check it one more time," and when one officer asked "[w]hat number is that," the other responded "[t]his is number four." The second officer then told K.V. that "we'll go through" and be "going to it over again."

After K.V. was shown photo numbers 5 and 6, the second officer asked K.V. to comment as he went through the array again on whether the person in each photo was the individual in question. The administering officer then presented each photo a third time. K.V. said the person in photo 1 was definitely not the one he saw. He said that the person in photo 2 "looks familiar" but asked for the "[n]ext one." In response to photo 3, he said "definitely not this one." At photo 4, K.V. said, "Yeah. It's pretty close."

When the administering officer observed that "you keep pausing on photo number four," K.V. responded "[i]t's pretty close . . . between them two." The second officer asked what was close, and K.V. explained that it was "the build" and "[t]he eyebrows." The administering officer then noted that K.V. had said "definitely not" in response to

11

photos 1 and 3 and asked if K.V. wanted "to look at photo number four some more?" K.V., however, asked if it was "all right if we check out the other one again," and the officer responded, "Yeah, we'll go through."

After showing photos 5 and 6 again, the administering officer showed the photos in order one more time. When he saw photo 2, K.V. said: "It's this one. Yeah, I don't think. It was number four." When the administering officer asked if "you're shaking your head number two right now," K.V. replied, "Yeah." After once again eliminating photo 3, K.V. looked at photo 4 and said "Yeah, this is it" and "Number four. What I, yeah, what I remember." When the administering officer asked what he remembered, K.V. said "[h]is build," "his eyebrows," "[h]is hair," "[e]verything is the same." Asked about the involvement of the person in photo 4, K.V. said, "I saw this guy as a shooter next to the car."

After concluding by showing K.V. photos 5 and 6, the administering officer asked whether he should go through the photos again, and K.V. replied "I'm good." When asked if the person in photo 4 was the shooter, K.V. responded "Yes, sir."

### 2. Pre-Trial Identifications

Due process prohibits identification testimony " 'if the identification procedures used were unnecessarily suggestive' " and render the resulting identification unreliable. (*People v. Avila* (2009) 46 Cal.4th 680, 698 (*Avila*).) An identification procedure is unduly suggestive if it causes the defendant to stand out in a way suggesting that the witness should select him (*ibid*.) and " 'give[s] rise to a very substantial likelihood of irreparable misidentification.' " (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.) In determining whether an identification procedure was unduly suggestive, courts consider " '(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances . . . .' " (*Holmes*, *supra*, 12 Cal.5th at p. 768, quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 989.) Defendants challenging an identification bear

12

the burden of demonstrating that the identification procedure was unduly suggestive and unreliable. (*Avila*, *supra*, 46 Cal.4th at p. 700; see also *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222 ["Defendant bears the burden of showing unfairness as a demonstrable reality, not just speculation."].)

### 3. *Composition of the Photo Lineup*

Oakes asserts that the photo lineup shown K.V. was unduly suggestive because, unlike the other photos, the photo of Oakes was displayed against a bright blue background, positioned low in the frame, and showed him wearing a shirt with pattern. We conclude that these factors did not make Oakes stand out and render the photo lineup unreliable.

We agree with the Attorney General that the six men included in the photo lineup are similar: All six are white or Hispanic, thickly built, and appear to be in their 30s. Their eyes are dark, their hair is close-cropped, they have little to no facial hair, and their facial expressions were similar. Importantly, the way in which the photos were presented does not make Oakes's photo stand out. Although Oakes correctly points out that only his photo has a bright blue background, the photos were shown to K.V. one-by-one, not together at once, which would have made differences in the backgrounds stand out more. In addition, all the photos had some variation in the color and brightness of their respective backgrounds. As a consequence, the different colored backgrounds do not make Oakes's photo stand out significantly. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1217 [holding that difference in background color and image size did not render photographs impermissibly suggestive].) Similarly, in Oakes's photo his head is in basically in the same position as the others. And while Oakes's photo is the only one with a patterned shirt, his shirt does not stand out any more than the all-white shirt in photo 1.

The Supreme Court has upheld photo lineups that were far more suggestive. For example, in *People v. Gonzalez* (2006) 38 Cal.4th 932 (*Gonzalez*), the defendant argued

13

that a photographic lineup was unduly suggestive because his photograph was the only one with " 'gang-type' clothing," and his photograph was discolored. (*Id*. at p. 943.) The Supreme Court disagreed, holding that neither the defendant's clothing nor the discoloration in the photograph of him suggested his photograph should be selected. (*Ibid*.) In *People v. Carter* (2005) 36 Cal.4th 1114 (*Carter*), the defendant argued that a photographic lineup was impermissibly suggestive because the photograph of him was the only one "wearing an orange shirt that resembled a 'jail jumpsuit,' " and while his photograph was "of 'booking-photograph quality' " and had a large border, the others were glossy Polaroid images with smaller borders. (*Id*. at p. 1162.) The Supreme Court held that the array was not unduly suggestive because the individuals in it were roughly the same age, they had similar hair color and facial hair, and their expressions were roughly comparable. (*Id*. at p. 1163.) The individuals depicted in the photo lineup here share similar characteristics, the photo quality is similar, and Oakes' patterned shirt is less distinctive than the orange shirt in *Carter*. Consequently, under *Carter* and *Gonzalez*, the photographic lineup in this case was not unduly suggestive.

Oakes points to *People v. Carlos* (2006) 138 Cal.App.4th 907 in asserting that the photo lineup was unduly suggestive. However, in that case the Court of Appeal concluded that a six-photo array was "plainly suggestive" because the defendant's name and an identification number appeared directly below his image and thus was almost "an arrow pointing to [him]." (*Id*. at p. 912.) Here, by contrast, the photos were shown one-by-one, and Oakes's photo has no name or identification number distinguishing it. The federal cases cited by Oakes do not help him either. In one, the court found that use of a color photograph of the petitioner from a front view and eleven black-and-white mug shots of others with both front and side views made the petitioner "st[and] out like the proverbial 'sore thumb' " (*Passman v. Blackburn* (5th Cir. 1981) 652 F.2d 559, 570), and in the other case a trial court found that "[t]he photo array was not unduly

14

suggestive." (*United States v. Mustafa* (N.D. Ga. 2012) 2012 U.S. Dist. LEXIS 73060, at *36.)

We conclude that the photo lineup shown K.V. was not unduly suggestive.

### 4. *Administration of the Photo Lineup*

Oakes also argues that the photo lineup was administered in an unduly suggestive fashion. In particular, he contends that the police officers who conducted the lineup "aggressively" steered K.V. towards his photo in three ways: (1) repeatedly skipping over his interest in photo 2 and volunteering to show K.V. the photo of Oakes (photo 4), (2) remarking about K.V. pausing on Oakes's photo and asking follow-up questions about that photo, but (3) asking no questions about photo 2. We are not persuaded.

In the first place, the officers administering the lineup did not skip over photo 2 and steer K.V. towards Oakes's photo. As Oakes points out, in the second time through the photos, after seeing Oakes's photo, K.V. asked to see photo 2 again. In response, the officers agreed to do so but told K.V. that they would "go through them all again." This response did not make Oakes's photo stand out in a way suggesting that K.V. should select him, much less create the substantial likelihood of an irreparable misidentification needed to invalidate the lineup. To the contrary, it appears that the officers did the same thing when K.V. asked to see Oakes's photo: After discussing why he paused on Oakes's photo, K.V. asked "can I check it one more time," but rather than showing K.V. Oakes's photo right away, the accompanying officer told K.V. "we'll go through . . . again, okay?" Thus, the officers appear to have followed a consistent protocol of showing the individual photos in order, one at a time, which did not in any way direct K.V. to photo 4.

Oakes points out that, during the third time through the photos, the police officers asked K.V. about Oakes's photo, but not about photo 2 even though K.V. commented on both photos. After commenting that the person depicted in photo 2 looked familiar, K.V. asked for the "[n]ext one." However, after noting that Oakes's photo was "pretty close," K.V. did not ask for the next photo. Instead, he appears to have paused. As a

15

consequence, it was natural and not unduly suggestive for the officers to observe that K.V. was pausing on Oakes's photo and to ask why.

We acknowledge that the officers did not ask any questions concerning photo 2 even though they noted that K.V. had said "definitely not" to photo 1 and photo 3. It is also troubling that the officer in the backseat during the photo lineup was aware that Oakes was a suspect. As the administering officer acknowledged in his testimony, this was a departure from best practices. In addition, rather than remaining silent, the officer in the backseat asked five questions during the administration of the lineup, one of which concerned what K.V. found "close" about photo 4, which was of Oakes. While this question may have conveyed an interest in photo 4, it occurred on the third pass through the photos after K.V. had twice paused on that photo. Although less than ideal practice, we do not view the second officer's presence and questioning during the identification procedure as unduly suggestive, much less creating a substantial likelihood of an irreparable misidentification. (*Simmons v. United States* (1968) 390 U.S. 377, 385-386, fn. omitted [a procedure is not unduly suggestive simply because the procedure "may have in some respects fallen short of the ideal"].)

In asserting that the officers improperly steered K.V. to his photo, Oakes cites *Foster v. California* (1969) 394 U.S. 440 (*Foster*) and *Solomon v. Smith* (2d Cir. 1981) 645 F.2d 1179 (*Solomon*). These cases are clearly distinguishable. In *Foster*, the police conducted two successive lineups where the defendant was the only repeat participant, and there was a one-on-one confrontation with the defendant in between the lineups. (*Foster*, at pp. 441, 443.) In *Solomon*, the witness was shown the defendant in court as well as a photo of the defendant before picking him out of a lineup in which he was far smaller than any of the other participants. (*Solomon*, at p. 1183.) Nothing so blatantly suggestive occurred here.

We conclude that the identification procedure in this case was not unduly suggestive and that K.V.'s identification of Oakes was properly admitted at trial.

16

**B. Accomplice Testimony**

While K.V. identified Oakes as one of Chacon's shooters, the primary evidence implicating Martinez and Cruz in the murder came from J.C., an admitted participant in the crime. J.C. and two other gang members, L.B. and A.V., also provided key testimony implicating Martinez in the nightclub shooting. Martinez and Cruz argue that J.C., L.B., and A.V. were accomplices in these incidents and that the prosecution presented insufficient evidence corroborating their testimony. We conclude that A.V. was not an accomplice and that the testimony of J.C. and L.B. was adequately corroborated.

*1. Corroboration of Accomplice Testimony*

Because accomplice testimony "comes from a tainted source and is often given in the hope or expectation of leniency or immunity" (*People v. Wallin* (1948) 32 Cal.2d 803, 808), the Legislature has determined that "such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' [Citations.]" (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).) Accordingly, section 1111 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111.)

In determining whether an accomplice's testimony " 'tend[s] to connect the defendant with the commission of the offense' " and thus satisfies the corroboration requirement, " '[t]he entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact.' " (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.) "The corroborating evidence need not by itself establish every element of the crime" or "independently establish the identity of the victim's assailant. [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 505-506 (*Abilez*).) Nor must the evidence " 'corroborate the accomplice as to every fact to which he testifies.' " (*People v. Davis* (2005) 36 Cal.4th 510, 543.) Instead, the corroborating evidence may be " ' "circumstantial or slight and entitled to little consideration when standing alone.

17

[Citation.]" ' " (*Romero and Self*, *supra*, 62 Cal.4th at p. 32.) However, the corroborating evidence must "tend to connect defendant with the commission of the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth." (*People v. Simpson* (1954) 43 Cal.2d 553, 563.) Moreover, the corroborating evidence must do so " 'without aid from the accomplice's testimony.' " (*Abilez, supra,* 41 Cal.4th at p. 505.)

A jury's determination that non-accomplice evidence tends to connect the defendant to the crime and satisfies the corroboration requirement must be upheld on appeal unless the corroborating evidence was inadmissible or insufficient to reasonably connect the defendant with the crime. (*People v. McDermott* (2002) 28 Cal.4th 946, 985-986.)

### 2. *The Chacon Murder*

J.C., who testified under a grant of immunity pursuant to a plea agreement, presented testimony implicating Martinez and Cruz in Chacon's murder, and both Martinez and Cruz argue that the prosecutor failed to corroborate this testimony. We conclude that J.C. was an accomplice to the murder, but evidence besides his testimony tends to connect both Martinez and Cruz to the murder, thereby satisfying the corroboration requirement.

#### a. J.C.'s Testimony

At trial, the prosecutor acknowledged that J.C. was an accomplice to the Chacon murder, and the court instructed the jury that J.C. was an accomplice as a matter of law as to that count.

J.C., who testified that he was a friend and frequent companion of Martinez, provided evidence that Martinez had a motive to kill Chacon. According to J.C., Martinez viewed himself as the boss of San Jose with "the last say-so" on behalf of the NF. As a consequence, Martinez was upset with Chacon claiming to be the one running San Jose and collecting taxes on the south side of the city. In addition, Martinez believed

18

that Chacon was dating a woman who might have been a federal informant, information that Martinez passed along to Larez.

J.C. also testified that Martinez participated in Chacon's murder. J.C. testified that on August 13, 2012, the day of Chacon's murder, Martinez picked up J.C. and said "Kung Fu" (Chacon) while mimicking shooting a gun, which J.C. understood to mean that Chacon was going to be shot. Martinez then stopped outside a restaurant where he met with Larez, Cruz, and Oakes, and Larez said that they were going to kill Chacon. J.C. also testified that Martinez drove with Larez and the others to Oakland Road where Chacon was shot, Martinez told him "[i]t's gonna happen" just before J.C. heard a gunshot, and afterwards Martinez told J.C. there had just been a "mob hit."

### b. Corroboration Concerning Martinez

Martinez argues that the jury lacked sufficient evidence independent of J.C.'s testimony to connect him to Chacon's murder and corroborate J.C. We conclude that the evidence of Martinez' motive and justification for murdering Chacon, his frequent contact on the day of the murder with a key participant in the crime, and his possible presence at the murder scene, provided sufficient corroboration.

The prosecution presented evidence that Martinez had both a motive and the ability to murder Chacon. L.B., who had no involvement in the Chacon murder and thus was not an accomplice to it, testified that Martinez had complained to him that Chacon was collecting taxes on behalf of a federal regiment, which had no jurisdiction over street regiments and therefore no authority to collect taxes from them. This transgression, L.B. also testified, would have justified murdering Chacon; indeed, L.B. sent a message to Chacon to "knock his shit off" or he would be "smacked," or killed. An expert on the Nuestra Familia gang concurred that a gang member who collected taxes without authority could be disciplined by, among other things, being murdered. And as Martinez had become the leader of the NF's Santa Clara County regiment, Martinez would have been in a position to arrange Chacon's murder.

19

Other evidence showed that Martinez was in frequent contact with Larez who drove with Oakes—whom K.V. identified as one of the men who shot Chacon—from Red Bluff to San Jose on the day of the murder. Indeed, in July and August 2012 Larez had over 60 telephone calls with Martinez, including one at 10:41 a.m. while Larez and Oakes were driving on the morning of the murder. That day Larez also had six telephone calls with Chacon, including one at 1:20 p.m., 10 minutes or so before the murder occurred.

In addition, it is reasonable to infer that Larez drove from Red Bluff to San Jose to meet with Martinez and kill Chacon before immediately returning to Red Bluff as Larez (1) traveled down from Red Bluff early in the morning of August 13 2012, (2) used the same cell phone tower as Chacon between 1:20 p.m. and 1:32 p.m. when Chacon was shot, and (3) was on his way back to Red Bluff with Oakes by 2:07 p.m.

Finally, surveillance video showed that Martinez might have been present at the scene of Chacon's murder. Specifically, video showed a Chevrolet pickup with an extended cab along with a black sedan in the area shortly before Chacon was murdered. When police officers served a search warrant at Martinez's home about two months after the murder, they found Martinez's wife in a gray Chevrolet pickup similar to the one depicted in the surveillance video.

This evidence, all of which was independent of the testimony of J.C. or any other accomplice to the Chacon murder, "tend[s] to connect" Martinez with the murder and therefore corroborates J.C.'s testimony. (§ 1111.) The testimony of L.B. and the gang expert showed that Chacon's unauthorized collection of taxes gave Martinez, who had only become leader of the Nuestra Familia's Santa Clara regiment in July 2012 and may have been sensitive about threats to his authority, both a motive and justification for murdering Chacon. In addition, cellphone evidence showed that Martinez was in close communication with the individuals who drove from Red Bluff to shoot Chacon. Martinez was in frequent contact with Larez in the days leading up the Chacon's murder,

20

and he spoke with Larez on the day of the murder, while Larez was driving from Red Bluff with Oakes, the man whom K.V. identified as one of Chacon's shooters. And surveillance video showed that Martinez's truck may have been at the scene of the murder. As corroborating evidence need only be " ' "circumstantial or slight" ' " (*Romero and Self*, *supra*, 62 Cal.4th at p. 32), we conclude that the evidence in this case was sufficient to assure the jury that J.C. was telling the truth and corroborate his testimony.

This conclusion is supported by the Supreme Court's decision in *People v. Szeto* (1981) 29 Cal.3d 20. The defendant in that case was convicted of being an accessory to a gang shooting that injured or wounded more than a dozen bystanders. (*Id*. at p. 26.) A gang member who drove the others to the shooting testified that, the morning after the incident, he and the defendant threw the guns used in the shooting into San Francisco Bay. (*Id*. at p. 28.) When the defendant objected that the gang member's testimony was not adequately corroborated, the Supreme Court disagreed. It reasoned that there was independent evidence that defendant was a gang member and therefore had a motive to assist his fellow gang members, and that defendant had the opportunity to help dispose of the guns because a witness saw him bring wonton soup to the house where the gang members were staying (and had their guns) on the morning after the shooting. (*Ibid*.) The independent corroborating evidence here—which showed Martinez's motive and justification for killing Chacon, his contact with the individuals who drove from Red Bluff to shoot Chacon, and his possible presence at the scene—was much stronger.

We conclude that the non-accomplice evidence here adequately corroborated J.C.'s testimony concerning Martinez's involvement in the Chacon murder.

c. Corroboration Concerning Cruz

Cruz also argues that J.C.'s testimony concerning his (Cruz's) participation was not sufficiently corroborated. While this is a closer question, we conclude that section 1111's corroboration requirement is satisfied here as well.

21

While the prosecutor did not present evidence that Cruz had any specific motive for killing Chacon, he did present independent evidence that Cruz was an NF associate and that Chacon's conduct warranted severe discipline by the gang, including death. In addition, cellphone records showed that on the day of the murder Oakes called Cruz early in the morning before he traveled to San Jose and in the evening after he had returned to Red Bluff, which is consistent with Cruz and Oakes driving from Red Bluff to San Jose to commit Chacon's murder.

Finally, and most importantly, there was evidence that Cruz was present at the scene of the crime and participated in it. J.O. saw three men in the black Honda, and he testified that the man in the back seat was Hispanic, in his early or mid-20s, about 5 feet 7 inches tall and 140 or 150 pounds. In addition, K.V. testified that he saw a smaller man running towards Chacon's Impala with a chrome gun and described that person as Hispanic, mid- or late 20s, with a dark complexion and dark hair. Based on this composite description, the prosecutor argued that Cruz was the individual described. We conclude that this evidence was sufficient to tend to connect Cruz with Chacon's murder and satisfy section 1111's corroboration requirement.

Accomplice testimony has been found corroborated based on similar identification testimony. In *People v. Cooks* (1983) 141 Cal.App.3d 224 (*Cooks*), a witness testified that she saw a man who was fairly young, of mixed race with a light complexion, and a medium build. (*Id*. at p. 252.) The witness in *Cooks* also saw a man next to a van that was black or white, which was similar to the defendant's white or beige van (*id*. at pp. 252, 259), and there was evidence that the defendant in question was a friend with another defendant (*id*. at p. 259). Based on this evidence, and the consistency of the accomplice's testimony with the testimony of other witnesses, *Cooks* found that the accomplice's testimony was adequately corroborated. (*Id*. at pp. 259-260.)

Here, the description of the defendant was even more detailed: J.O. and K.V. testified that they saw a Hispanic man in his 20s with a dark complexion and dark hair,

22

who was 5 feet 7 inches tall and 140 or 150 pounds. There was video evidence that a black Honda similar to the one that was owned by Larez and whose keys the police found in Oakes' possession was at the scene, an eyewitness testified that there were three passengers in a black Honda on Oakland Street, and cellphone records showed that on the day of Chacon's murder Cruz was in contact with Oakes, whom K.V. identified as the first shooter. As a consequence, the evidence here tended to connect Cruz to Chacon's murder as much as the evidence in *Cooks*.

Citing *People v. Robinson* (1964) 61 Cal.2d 373 (*Robinson*) and *People v. Santo* (1954) 43 Cal.2d 319 (*Santo*), Cruz argues that the eyewitnesses' descriptions of him were too general to provide adequate corroboration. In *Robinson*, the Supreme Court held that a defendant's fingerprints on the car used in a robbery and murder could not corroborate an accomplice's testimony because there were plausible, innocent explanations for why defendant's fingerprints were on the car, which was owned by an acquaintance. (*Robinson*, *supra*, 61 Cal.2d at pp. 397-399.) This ruling has no bearing on whether the combined description of the eyewitnesses in this case sufficiently identified Cruz to satisfy the corroboration requirement. *Santo* does not offer Cruz any support either, as the Court of Appeal in that case found the accomplice's testimony was adequately corroborated. (*Santo*, *supra*, 43 Cal.2d at pp. 327-330.)

*People v. Pedroza* (2014) 231 Cal.App.4th 635 is inapposite as well. In *Pedroza*, the Court of Appeal concluded that accomplice testimony was not corroborated by evidence that "the defendant was in the same gang as the victim and [the accomplice]," the gang "was experiencing frequent in-house murders," and the defendant was with the accomplice and other gang members several hours after the murder took place. (*Id*. at p. 651.) Here, as well, the evidence shows that Cruz was associated with the NF organization, that there was an in-house murder, and that he was with gang members several hours before a murder took place. Moreover, in this case, there was testimony placing a man matching Cruz's description—including ethnicity, age, height, weight, and

23

complexion—at the scene of the murder, which could have satisfied the jury that J.C. truthfully testified that Cruz was the third man in the black Honda who shot Chacon after Oakes. Thus, the connection in this case was even stronger than in *Pedroza*.

We conclude that J.C.'s accomplice testimony concerning the Chacon murder was sufficiently corroborated as to Cruz.

### 2. *The Nightclub Shooting*

In addition to Chacon's murder, Martinez was convicted of attempted murder and assault with a firearm in a nightclub shooting. In connection with this incident, the prosecution presented testimony from three witnesses–J.C., L.B., and A.V.—who testified under grants of immunity. Martinez argues that all three witnesses were accomplices, and their testimony was not sufficiently corroborated. We conclude that A.V. was not an accomplice to the nightclub shooting and that his testimony sufficiently corroborated the testimony of J.C. and L.B.

#### a. The Testimony of J.C., L.B., and A.V.

J.C. testified that he, L.B., Martinez, and R.P., another gang member, went to a rap concert at the Creekside Bar and Grill in January 2012 and that J.C. decided with Martinez that J.C. should be the one to carry a gun for their protection because he was the only who had not been imprisoned. When a fight involving L.B. broke out inside the club, J.C. pulled out the gun and used it to wave people out of their way as he, Martinez, L.B., and R.P. exited the club. In the parking lot, someone charged at Martinez and J.C., and Martinez told J.C. to shoot that person. J.C. aimed the gun at the person and shot twice. After the shooting, J.C. and Martinez drove to A.V.'s house, which was close by and where L.B. and R.P. met them, and the four talked about what happened at the club.

L.B. testified that he and R.P. went to the concert at the nightclub where they met Martinez and J.C., and Martinez told him that he and J.C. were bringing a gun. L.B. also testified that, after some pushing and shoving on the dance floor, someone hit him on the back of the head with a bottle, and R.P. stabbed that person. L.B. then heard Martinez

24

loudly tell J.C. to "get the gun."  As they were leaving the nightclub, L.B. also heard Martinez tell J.C. "shoot them fools," after which J.C. shot at a group of men coming towards L.B. and R.P.  Later L.B. went to A.V.'s house, where Martinez bragged that "we shot them fools."

A.V. testified that on the morning after the concert, around 2:00 or 3:00 a.m., Martinez, J.C., L.B., and R.P. came to his house.  He said that all four were hyped up as if they had been in an altercation.  J.C. told A.V. that he had pulled out a gun, Martinez had said "shoot, shoot," and J.C. did so.  Martinez agreed that is what happened.

b.  A.V.'s Status

The prosecutor acknowledged that J.C. and L.B. were accomplices to the nightclub shooting, but argued that their testimony was corroborated by A.V., who was not an accomplice.  Although Martinez did not argue at trial that A.V. was an accomplice, Martinez now contends that A.V. was.  We are not persuaded.

For purposes of the corroboration requirement, an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  (§ 1111)  An individual is not deemed "liable" in this sense if the individual was merely an accessory to the offense charged.  (*People v. Horton* (1995) 11 Cal.4th 1068, 1114; *People v. Fauber* (1992) 2 Cal.4th 792, 833-834.)  "To be chargeable with an identical offense, a witness must be considered a principal" (*People v. Lewis* (2001) 26 Cal.4th 334, 368), which means that the individual must be either a direct perpetrator of the offense or someone who aided and abetted in its commission.  (§ 31 [defining "principals"].)  An individual aids and abets in the commission if "acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, [or] (3) by act or advice," the individual "aids, promotes, encourages or instigates, the commission of the crime."  (*People v. Beeman* (1984) 35 Cal.3d 547, 561; see also *People v. Nguyen* (1993) 21 Cal.App.4th 518, 530 ["knowledge

25

of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime"].)

Martinez points to testimony from A.V. that he gave Martinez the .22 caliber gun that J.C. used in the nightclub shooting. A.V., however, did not testify when he did this. In addition, far from showing that A.V. intended to encourage or facilitate any crime, the evidence shows that A.V. traded a .22 caliber handgun, which was easy to hide, for a larger and presumably more lethal .38 caliber handgun. Even more important, there is no evidence that A.V. or anyone else anticipated that L.B. and R.P. would get into a fight at the nightclub, much less intended that J.C. would use the gun to shoot individuals approaching L.B. and R.P. outside the club. As Martinez bears the burden of proving that A.V. was an accomplice, and we are required to "resolve all inferences and inconsistencies in favor of the jury's implied finding that [A.V.] was not an accomplice" (*People v. Tewksbury* (1976) 15 Cal.3d 953, 962), we conclude that the nightclub shooting was unplanned and that A.V. did not aid and abet in it.

Martinez notes that, at one point, the trial court instructed the jury that A.V. as well as J.C. and L.B. were accomplices as a matter of law. While that is true, the trial court did so only in passing in what appears to have been a mistake. In addition, shortly before, the trial court instructed the jury that "[b]efore you may consider the statement or testimony of [A.V.] as evidence against Defendant Angel Martinez . . . you must decide whether [A.V.] was an accomplice to the charged crime" and that "[t]he burden on the defendant is to prove it is more likely than not that [A.V.] was an accomplice." In keeping with this latter instruction, the prosecutor argued to the jury, without objection from Martinez, that A.V. was an accomplice on some counts but not on the counts relating to the nightclub shooting. We see no likelihood that the jury was confused by the passing suggestion that A.V. was an accomplice as a matter of law, and Martinez has offered no basis for deeming A.V. an accomplice based on such an instruction absent

26

evidence or argument supporting that suggestion. (See *People v. Nelson* (2016) 1 Cal.5th 513, 546-547 [if trial record contains an erroneous instruction, reversal is required only if the error was likely to have misled the jury]; *People v. Young* (2005) 34 Cal.4th 1149, 1202 [reviewing court should consider the arguments of counsel in assessing the probable impact of an instruction on the jury].)

        c.   <u>Corroboration of J.C.'s and L.B.'s Testimony</u>

A.V.'s testimony corroborates the accomplice testimony of J.C. and L.B. It showed that Martinez, J.C., L.B., and R.P. had been in a fight at a concert, that J.C. told A.V. that he had shot a gun at Martinez's request, and that Martinez implicitly admitted this account. This admission tends to connect Martinez to the nightclub shooting and corroborates the testimony of J.C. and L.B.

## C. Gang-Related Issues

Martinez, Cruz, and Oakes were convicted of one count of active participation in a criminal street gang in violation of section 186.22, subdivision (a), and the jury found true several gang-related enhancements and special circumstances. Defendants seek to vacate these convictions and findings in light of intervening changes to the criminal street gang statute enacted by the Legislature in Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assem. Bill 333). In addition, they argue their convictions on other counts should be vacated in light of the bifurcation provision added by Assem. Bill 333. As explained below, we agree that the gang-related convictions and findings should be vacated in light of Assem. Bill 333, but conclude that Assem. Bill 333's bifurcation provision is not retroactive and therefore does not affect other aspects of the verdicts.

### 1. *Assem. Bill 333*

Because the changes to the criminal street gang statute in Assem. Bill 333 are ameliorative, the Supreme Court has held that those changes apply retroactively to cases on appeal such as this one. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206-1207 (*Tran*).) Defendants argue that, because the jury was instructed on requirements that Assem.

Bill 333 changed, those instructions were erroneous, and the jury's gang-related convictions and findings must be vacated. The Attorney General does not dispute that the jury instructions were erroneous under Assem. Bill 333, but argues that this error was harmless.[3] We are not persuaded

Defendants were convicted of violating section186.22, subdivision (a), which makes it a criminal offense to "actively participate[] in a criminal street gang" with knowledge that gang members engage in "a pattern of criminal gang activity" and to willfully promote, further, or assist in felonious conduct by gang members. (§ 186.22, subd. (a).) In addition, the jury found true allegations that defendants intended to promote, further, or assist in criminal conduct by gang members under section 186.22, subdivision (b), that in the commission of a gang-related offense, a principal discharged a firearm, causing death under section 12022.53, subdivisions (d) and (e)(1), and that defendants were acting to further gang activities under section 190.2, subdivision (a)(22). These convictions and findings were all predicated on the criminal street gang statute's definition of criminal street gang and the related definitions of "pattern of criminal activity" and "common benefit."

Assem. Bill 333 changes these definitions. It "narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' " (*Tran*, *supra*, 13 Cal.5th at p. 1206, quoting § 186.22, subd. (f), italics added.) Assem. Bill 333 also amended the definition of "pattern of criminal gang activity" to require that "that any such pattern have been '*collectively* engage[d] in' by members of the gang." (*Ibid*., quoting § 186.22, subd. (f),

<hr>

[3] The Attorney General also argues that application of Assem. Bill 333's changes to the gang-murder special circumstance in section 190.2, subdivision (a)(22) would unlawfully amend Proposition 21, the initiative that added the gang-murder special circumstance. After briefing in this case was completed, the Attorney General withdrew this argument in light of the Supreme Court's rejection of the argument in *People v. Rojas* (2023) 15 Cal.5th 561, 580.

italics added.)  And Assem. Bill 333 required that the offenses needed to establish a pattern of criminal gang activity "commonly benefitted" the gang and that any common benefit "be 'more than reputational.' "  (*Ibid.*, citing § 186.22, subd. (g).)

Although the jury was not instructed on these new requirements, the Attorney General argues that this failure was harmless.  Because Assem. Bill 333's changes affected the elements of the defendants' criminal gang participation conviction, the federal harmless error standard applies, and the Attorney General must show that the error was harmless beyond a reasonable doubt.  (*People v. Cooper* (2023) 14 Cal.5th 735, 742 (*Cooper*); *Tran*, *supra*, 13 Cal.4th at p. 1207.)  In addition, because the jury was not instructed on the elements added by Assem. Bill 333, the trial court's instructions must be treated as if they omitted or misdescribed a fact required for the offense (*Cooper*, at pp. 742-473), which means that the error was harmless only if " ' " '[n]o reasonable jury' " would have found in favor of the defendant on the missing fact . . . .' "  (*People v. Schuller* (2023) 15 Cal.5th 237, 261); see also *In re Ferrell* (2023) 14 Cal.5th 593, 605 [considering "whether a reasonable jury, given the findings actually made and the state of the evidence, could have found in favor of the defendant"].)

The Attorney General has not satisfied this standard.  He concedes that the testimony of the prosecution's gang expert concerning convictions of NF members fails to satisfy Assem. Bill 333 because the convictions did not show that the underlying crimes commonly benefit the NF organization in a way that was more than reputational.  However, the Attorney General argues that any reasonable jury would have found a pattern of criminal activity based on (1) J.C.'s testimony that at some point after the Creekside incident, he and other Norteños, who had been summoned by Martinez to help him, shot at a Sureño in a red truck who had been "mean mugging" him and Martinez; and (2) L.B.'s testimony that he committed five bank robberies in December 2011 and January 2012, two of which were committed with NF associate B.B. and two with NF associate R.P.  However, to establish a pattern of gang activity after Assem. Bill 333, a

prosecutor must prove the commission of two or more offenses that "commonly benefited a criminal street gang" and that the "common benefit from the offenses is more than reputational." (§ 186.22, subd. (e)(1).) While the prosecutor presented testimony from L.B. that he intended the robberies he committed to benefit the NF gang by reinvesting a portion of the proceeds in purchasing drugs, it is unclear from this testimony whether L.B. actually did so: When asked where the money he stole was, L.B. stated, "I don't know" and "I never did nothing with it." Consequently, a reasonable jury could have concluded that the NF organization was not commonly benefited by the robberies and therefore that the prosecution failed to prove a pattern of criminal street gang activity.

The Attorney General may well be able to show on remand that L.B.'s robberies provided a collective benefit to the NF organization and establish a pattern of criminal activity. However, to establish harmless error under the federal standard, "it is not enough that . . . substantial or strong evidence existed to support a conviction under the correct instructions." (*People v. Sek* (2022) 74 Cal.App.5th 657, 668 (*Sek*).) Accordingly, the proper remedy here "is to remand and give the People an opportunity to retry the affected charges." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)

We therefore will vacate defendants' convictions for participating in a criminal street gang and the findings concerning gang-related enhancements and special circumstances. On remand, the prosecutor should elect whether to retry defendants on these matters. (See *Sek supra*, 74 Cal.App.5th at p. 370.)

### 2. *Bifurcation*

Martinez, Cruz, and Oakes also contend that, in light of the bifurcation provision in section 1109, which was added by Assem. Bill 333 (Stats. 2021, ch. 699, § 5), their convictions for murder and other offenses besides participation in a criminal street gang should be vacated. This argument fails because the Supreme Court recently held that section 1109 does not apply retroactively. (*People v. Burgos* (2024) 16 Cal.5th 1, 8.)

30

**D. Cruz's Additional Arguments**

Cruz challenges his convictions on several additional grounds. We address each in turn.

### 1. Evidence of Drug Use by Cruz

In cross-examining J.C., Oakes's lawyer sought to attack J.C.'s credibility by questioning him about misconduct after he began cooperating with law enforcement, including dealing drugs in jail. In response, J.C. admitted to possessing methamphetamine in jail and said he gave some to Cruz as he "felt bad" because "me being truthful brought him in this predicament." Because Cruz's attorney did not object to the questioning or move to strike J.C.'s response, Cruz now contends that he was deprived of effective assistance of counsel. We are not persuaded.

Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, criminal defendants are entitled to effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-686 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).) To establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness, under prevailing professional norms and (2) this deficient performance was prejudicial. (*Strickland*, at pp. 688, 692; *Ledesma*, at pp. 216-217.) In addition, to avoid the distorting effects of hindsight, the Supreme Court has adopted "a strong presumption that counsel's performance [fell] within the wide range of reasonable professional assistance" and that the challenged actions reflected a " 'sound trial strategy.' " (*Strickland*, *supra*, 466 U.S. at p. 689.) In light of this presumption, deficient performance is especially difficult to demonstrate on direct appeal: If the record does not show why counsel chose to act or to not act, the reviewing court must reject challenges to counsel's conduct " ' "unless counsel was asked for an explanation and failed to provide one, or unless there

simply could be no satisfactory explanation." ' " (*People v. Kelly* (1992) 1 Cal.4th 495, 520 (*Kelly*).)

Cruz has not shown deficient performance. He contends that his trial counsel should have objected to the testimony that J.C. passed drugs to him because the testimony was irrelevant and unduly prejudicial under Evidence Code section 352. However, in closing argument, Oakes' attorney used the evidence that J.C. was dealing drugs in jail to argue that J.C. was a hardened criminal who did not change his ways after he began cooperating and that he was a liar because his story of gifting drugs to Cruz was not believable. Cruz's trial attorney reasonably could have determined that the benefits of this argument in undermining J.C.'s credibility outweighed any prejudice from the suggestion that Cruz used drugs (and that the jury would be more receptive to the argument if it came from codefendants' counsel). As a consequence, not objecting to the testimony in question was a reasonable tactical choice that fell within the wide range of reasonable professional assistance. (See *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092 ["[T]he decision to object or not to object to the admission of evidence is inherently tactical, and a failure to object will seldom establish ineffective assistance."].)

### 2. *The Prosecutor's Closing Argument*

Cruz also contends that the prosecutor committed misconduct during closing argument by referencing a fact that was not in evidence, and that his lawyer at trial rendered ineffective assistance by failing to object to this misconduct. Here again, Cruz's argument is unavailing.

During closing argument, the prosecutor told the jury, "The call detail records, 5601 [Larez's phone number], shows a call to the victim at 10:40. And a minute later, a call to Angel Martinez at 10:41. Again, we know they were all together, Defendant Oakes, Defendant Cruz, and Alberto Larez, they were pinging off the same tower in Vallejo." In fact, while, as previously mentioned, the prosecutor had cellphone records for Larez and Oakes showing their phones were using the same cell tower on the morning

32

of Chacon's murder, the prosecutor was unable to obtain any records for Cruz on that date.

Cruz's trial counsel did not object to the misstatement, but raised the absence of Cruz's cellphone records in his closing argument: "[D]o you know who else did not drag Ruben Cruz into this? The Government's . . . own phone expert—cell phone expert— doing all those fancy high-tech things about phones." The government's expert, Cruz's trial counsel reminded the jury, testified about only three cellphone numbers on the day of the shooting, and then trial counsel said, "Who were those numbers? Martin Chacon, Oakes, and 'Bird' [Larez]. Who's not included in that? Ruben Cruz." Far from disputing this, the prosecutor acknowledged in his rebuttal argument that the police were unable to obtain Cruz's cellphone records.

Because Cruz did not object to the prosecutor's statement concerning his cellphone records, he has forfeited any direct claim of prosecutorial misconduct. "To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury." (*People v. Brown* (2003) 31 Cal.4th 518, 553.) Failure to object and request a curative admonition will be excused only if an objection would have been futile or an admonition would not have cured the harm. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.) Cruz does not argue that his failure is excused in these ways. We therefore conclude that Cruz has forfeited any direct claim of prosecutorial misconduct.

Cruz argues that by failing to object to the prosecutor's comments, his trial attorney rendered ineffective assistance that was so prejudicial that his convictions must be reversed. This argument is unpersuasive. As noted above, there is a strong presumption that trial counsel acted within the wide range of reasonable professional assistance especially where, as here, there is no evidence in the record concerning the reason for counsel's choice. (*Strickland*, *supra*, 466 U.S. at p. 689; *Kelly*, *supra*, 1

33

Cal.4th at p. 520.) Here, there is no evidence why Cruz's counsel chose not to object to the prosecutor's misstatement, but counsel reasonably may have decided that the most effective way to deal with the prosecutor's misstatement was to correct it in his own closing argument, and especially in light of the prosecutor's acknowledgement that the police were unable to obtain Cruz's cellphone records, we cannot say that this was an unreasonable tactic. Accordingly, we conclude that counsel's failure to object did not constitute constitutionally deficient performance.

### 3. *Cumulative Error*

Cruz contends that the cumulative effect of the trial court's errors and the ineffectiveness of his trial counsel prejudiced him and warrants reversal of the judgment. As we have concluded that there was no error or ineffectiveness, there is nothing to cumulate and this argument fails.

### E. Sentencing Issues

Defendants challenge several aspects of their sentences. Cruz and Oakes contend that the sentences imposed on them for participating in a criminal street gang must be stayed under section 654 because those convictions were based on the murder of Chacon, the same conduct underlying their murder convictions. Cruz also contends that his abstract of judgment does not accurately reflect the actual custody days awarded by the trial court. Finally, Martinez contends (and the Attorney General concedes) that the trial court imposed an excessive sentence for his attempted murder conviction arising out of the nightclub shooting. Because we are vacating defendants' convictions on the criminal street gang participation charges in light of Assem. Bill 333, defendants are entitled to full resentencing on remand. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].) We therefore leave the sentencing issues raised by defendants for the trial court to consider on resentencing.

## III. Disposition

The judgments in H047687 and H047386 are reversed. The matters are remanded to the trial court with directions to vacate the convictions of defendants Martin, Cruz, and Oakes on count 1 of the indictment (Pen. Code, § 186.22, subd. (a)) and to vacate all gang-related special circumstances and gang-related enhancements. The prosecutor may elect to retry defendants on the vacated count, the gang-related special circumstances, and the gang-related enhancements. The trial court is also directed to vacate defendants' sentences and, after the prosecutor's election and any retrial, to conduct a full resentencing.

_____
BROMBERG, J.

WE CONCUR:

_____
GREENWOOD, P. J.

_____
GROVER, J.

*People v. Cruz et al.*
H047687
*People v. Martinez*
H047386